J-S21026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JESSE SMOOT | |
| Appellant | No. 3154 EDA 2014 |

Appeal from the Judgment of Sentence June 20, 2014
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0005867-2013,
CP-09-CR-0005868-2013, CP-09-CR-0005869-2013,
CP-09-CR-0005875-2013, CP-09-CR-0005876-2013,
CP-09-CR-0005879-2013, CP-09-CR-0005882-2013,
CP-09-CR-0005883-2013

BEFORE:  BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED MAY 04, 2016**

Jesse Smoot appeals from the judgment of sentence entered in the Court of Common Pleas of Bucks County.  After our review, we rely on the comprehensive opinion authored by the Honorable Wallace H. Bateman, Jr. to affirm the judgment of sentence.

A jury convicted Smoot of ten counts of robbery,[1] ten counts of theft by unlawful taking,[2] eight counts of conspiracy[3] and five counts of terroristic

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S. § 3701(a)(1)(ii), (iv).
[2] 18 Pa.C.S. § 3921(a).
[3] 18 Pa.C.S. § 903(a).
*(Footnote Continued Next Page)*

threats.[4]  The charges stemmed from a string of armed robberies at local businesses in North Wales and Horsham, Montgomery County, and Langhorne, Fairless Hills, Yardley, New Britain and Middletown Township, Bucks County.[5]

Following trial, the court sentenced Smoot to twenty-eight (28) to seventy (70) years' incarceration, following by fifty-five (55) years' probation.  Smoot filed a post-sentence motion, which the sentencing court denied.  This appeal followed.

On appeal, Smoot raises six issues for our review:

1. The trial court abused its discretion in denying the Appellant's pretrial motion for continuance where the court permitted new counsel to enter [his appearance] on behalf of Appellant to represent him at trial, but allowed new counsel less than twenty (20) days to be ready to try a case involving ten different armed robberies, and where on the day of trial, defense counsel candidly advised the trial court that he was not prepared to properly litigate the Appellant's claim and defend him at trial?

2. The Appellant was denied a fair trial where the Commonwealth hid the fact, until Appellant's sentencing, despite having been asked prior to trial, that it had negotiated a sentence with Commonwealth witness John Ferraro, in return for his testimony, at trial, thereby allowing its principal Commonwealth witness to testify falsely at the Appellant's trial, in violation of federal and state law, adopted by the Courts, in ***Brady v. Maryland***, 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963), and the Court should arrest the verdicts and judgment of sentence, and discharge the

*(Footnote Continued)* ─────────────────

[4] 18 Pa.C.S. § 2706(a)(1).
[5] The trial court granted the Commonwealth's motion for consolidation.

Appellant. *See Commonwealth v. Jay. C. Smith*, 532 Pa. 177, 615 A.2d 321 (1992); *Commonwealth v. Simons*, 514 Pa. 10, 16, 522 A.2d 537, 540 (1987); *Oregon v. Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L.Ed. 2d 416 (1982).[6]

3. The trial court abused its discretion and committed errors of law in not granting Appellant's motion to sever the ten robbery cases where the evidence admissible in some cases was not admissible in the others and where the victims were different and the dates of the robberies were different.

4. The trial court abused its discretion and committed errors of law in denying Appellant's motion for mistrial, where the trial court allowed and the Appellant objected to Commonwealth's introduction of prior bad acts, allegedly committed by the Appellant, thereby unduly prejudicing the Appellant and denying him a fair trial.

5. The trial court erred in not granting Appellant's motion for mistrial, where the Commonwealth introduced alleged voice identification evidence at trial, tough Commonwealth witness Cameron Ralston, where the voice identifier was not able to identify the Appellant's voice and the court allowed Detective Andrew Amoroso to identify the Appellant's voice as that of the robber, even though the Detective was not present at or during the robbery in question.

6. Appellant was sentenced to an aggregate sentence of twenty-eight (28) to seventy (70) years['] incarceration, in a state correctional institution, followed by fifty-five (55) years [of probation] for his February 7, 2014 convictions of ten (10) counts of Robbery, ten (10) counts of Theft by Unlawful Taking, eight (8) counts of Criminal Conspiracy, and five (5) counts of Terroristic Threats, by Bucks County Court of Common Pleas Judge, the Honorable Wallace H. Bateman, for crimes that the Appellant did not commit and where the

---

[6] Smoot filed a "Motion for an Order Directing the Clerk of Courts of Bucks County to Certify the Sentencing Transcript of March 11, 2014, in Commonwealth v. John Ferraro, Docketed at CP-09-0005863-2013, as Part of the Appellate Record." We deny this motion. Although the transcript has been included in the Reproduced Record, it is unnecessary to our review and disposition of the issue.

evidence presented by the Commonwealth was insufficient to sustain the verdicts, therefore Appellant's sentence was excessive, harsh and unlawful.[7]

Appellant's Brief, at 7-8.

Smoot first argues that his new counsel had only twenty days to prepare for trial. Smoot hired a new attorney, his third, shortly before the start of trial, and after the court had already granted two continuances at Smoot's request. Smoot claims his third attorney advised the court on the day of trial that he was not prepared to defend Smoot at trial. However, the court noted that the changes in counsel resulted in various delays, and that after granting the second continuance, the court informed Smoot it would grant no further continuances. The trial court determined that Smoot's change of counsel served to "clog the machine of justice." *See* Trial Court Opinion, 3/27/15, at 74. Under the circumstances, we agree, and we find no abuse of discretion. *See Commonwealth v. Boxley*, 948 A.2d 742, 746 (Pa. 2008); *see also Commonwealth v. Brown*, 505 A.2d 295, 298 (Pa. Super. 1986).

Smoot also claims the Commonwealth committed prosecutorial misconduct by failing to disclose a negotiated sentence with co-conspirator John Ferraro, the getaway driver in six of the robberies, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Smoot claims the Commonwealth

---

[7] Smoot has abandoned the sufficiency of the evidence claims in the Argument section of his appellate brief. *See* Pa.R.A.P. 2119.

"hid" the fact of a negotiated sentence, "thereby allowing its principal . . . witness to testify falsely at [his] trial[.]" Appellant's Brief, at 16. Smoot's argument relies on the prosecutor's misstatement at Smoot's sentencing hearing. There, the prosecutor inadvertently referred to Ferraro's plea as negotiated. *See* N.T. Sentencing, 6/20/14, at 133. Thereafter, at the October 15, 2014 hearing on post-trial motions, the prosecutor stated: "[W]ith regards to Mr. Ferraro, there were no negotiations on or off the record." N.T. Post-Trial Motions, 10/15/14, at 71. Referring to a January 21, 2014 letter from the Bucks County District Attorney's Office to Clinton Johnson, Esquire, Smoot's defense counsel, attached as Exhibit A of the Commonwealth's sentencing memorandum, the prosecutor stated:

> Number 2[8] of that same letter states: On January 6th, 2014, John Ferraro pled guilty before the Honorable Judge Wallace Bateman, and his sentencing was deferred. Mr. Ferraro has no agreement with the Commonwealth regarding his cooperation, nor has he entered into any negotiations with the Commonwealth. This is absolutely 100 percent accurate. At Mr. Smoot's sentencing, and those are the pages I believe that have been provided by Mr. Johnson, I mistakenly said that both defendants were negotiations. That was wrong. And as soon as I realized that was wrong, I called Mr. Johnson on phone, and I told Mr. Johnson on the phone that that was wrong. I then, Your Honor, followed up with a letter, an e-mail. . . . That I misstated that both were negotiated. Exhibit C, Your Honor, in the reconsideration memo that I've made part of the record, is an e-mail from myself to Mr. Johnson that states: I noticed in your motion for post-sentence relief that you allege that I've committed [a] Brady violation. One of the allegations that you

---

[8] Number 1 referred to co-conspirator Bruce Epp, who Smoot used as a getaway driver when Ferraro was not available.

made is based on a supposed deal between the Commonwealth and Mr. Ferraro. You allege that I withheld the negotiation until the time of sentencing. I believe this is based on a misstatement that was made at Mr. Smoot's sentencing. I then go on: Please find a copy of the transcript from Mr. Ferraro's sentencing to support that there was no such deal. In fact, if you look to Page 36, you will note that I had asked the Court for a sentence higher than that which was handed down. . . . Mr. Johnson absolutely had the information that Mr. Ferraro pled guilty. He absolutely had the information that it was an open guilty plea. . . . Mr. Johnson was given an opportunity to review all of the evidence, all of the materials, all of the discovery in this case, and that was consistent with my open-file policy.

N.T. Post-Trial Motions, 10/15/14, at 71-79. We agree with the court's reasoning that this information did not meet the three-part **Brady** test – the prosecutor did not suppress evidence; the evidence was not helpful to Smoot; and Smoot was not prejudiced. **See** Trial Court Opinion, 3/27/15, at 80-81.

Next, Smoot claims that the trial court abused its discretion in denying his motion to sever the ten robbery cases where the evidence admissible in some cases was not admissible in the others, and where the victims were different and the dates of the robberies were different. We find no abuse of discretion. **Commonwealth v. Jones**, 610 A.2d 931, 936 (Pa. 1992). In the trial of one robbery, evidence of the other nine was admissible as a common scheme. The Commonwealth satisfied the three-part test set forth in **Commonwealth v. Lark**, 543 A.2d 491, (Pa. 1988) (evidence of each offense admissible in separate trial for others; such evidence is capable of separation by jury to avoid danger of confusion and, if answers to these

inquiries are affirmative, whether defendant will be unduly prejudiced by consolidation of offenses).

In his fourth issue, Smoot claims that the trial court erred in denying his motion for a mistrial, where the trial court allowed and Smoot objected to the Commonwealth's introduction of prior bad acts, in particular, prior drug use. Evidence of prior bad acts is not admissible to show propensity, but is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident . . . [and] is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). Here, the Commonwealth introduced evidence that Smoot used the money he obtained from the robberies to purchase Percocet. The evidence was admissible, therefore, to prove motive, as well as to "complete the story of [the] crime." **See Lark**, **supra** at 497. We find no error or abuse of discretion. **See** Trial Court Opinion, 3/27/15, at 68-71.

Next, Smoot claims that the trial court erred in denying his motion for a mistrial where the Commonwealth introduced voice identification evidence at trial. The trial court properly allowed the jury to weigh the witness' testimony that the voice he heard from Smoot in the courthouse was the same voice of the robber. We find no error. **See Commonwealth v. Jones**, 954 A.2d 1194, 1997 (Pa. Super. 2008) (witness may testify as to defendant's identity from voice alone; weight to be accorded such

identification testimony is for trier of fact). ***See also*** Trial Court Opinion, 3/27/15, at 57-60.

Finally, Smoot argues his sentence was excessive. Smoot acknowledges that a challenge to the discretionary aspects of sentence is considered a petition for permission to appeal and not an appeal as of right. ***See*** Appellant's Brief, at 33. He also acknowledges the requirement of a Pa.R.A.P. 2119(f) statement presenting a substantial question as to the appropriateness of the sentence. ***Id.*** at 33-34. However, he fails to present a separate Rule 2119(f) Statement in his brief. ***See*** Pa.R.A.P. 2119(f). While this does not automatically waive his claim on appeal, "we may not reach the merits of claims where the Commonwealth has object[ed] to the omission of the statement." ***Commonwealth v. Farmer***, 758 A.2d 173, 182 (Pa. Super. 2000) (citation omitted). ***See also Commonwealth v. Hudson***, 820 A.2d 720 (Pa. Super. 2003). Here, the Commonwealth has noted its objection to the omission of the Rule 2119(f) statement, ***see*** Commonwealth's Brief, at 49, and, accordingly, we find that Smoot has waived his challenge to the discretionary aspects of his sentence.

We have reviewed Judge Bateman's well-reasoned opinion, which comprehensively analyzes Smoot's claims on appeal, and therefore, we adopt his Pa.R.A.P. 1925(a) opinion. We direct the parties to attach a copy of Judge Bateman's opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2016

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

| | | |
|---|---|---|
| CP-09-CR-0005867-2013 | : | COMMONWEALTH OF PENNSYLVANIA |
| CP-09-CR-0005868-2013 | : | |
| CP-09-CR-0005869-2013 | : | v. |
| CP-09-CR-0005875-2013 | : | |
| CP-09-CR-0005876-2013 | : | JESSE SMOOT |
| CP-09-CR-0005879-2013 | : | |
| CP-09-CR-0005882-2013 | : | |
| CP-09-CR-0005883-2013 | : | |
| | : | |

## OPINION

Defendant Jesse Smoot (hereinafter "Appellant") appeals this Court's June 20, 2014 Judgment of Sentence and October 17, 2014 Order denying Appellant's Post Sentence Motions. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## FACTUAL BACKGROUND

### A. Jury Trial

Appellant's jury trial began on January 30, 2014 and concluded on February 7, 2014. The jury determined that Appellant committed ten (10) separate armed robberies at various businesses in Bucks County and convicted Appellant of all charges with the exception of one count of conspiracy.[1]

The Commonwealth began its case-in-chief by presenting the testimony of Evan Andrews. Mr. Andrews was an employee at a Lukoil gas station located on 152 East Maple Avenue in Langhorne, Bucks County. In the early morning hours of August 3, 2012, Mr. Andrews was working alone. At approximately 4:00 a.m., Mr. Andrews was in the back room when he heard the door buzzer indicating that someone had entered the store. As Mr. Andrews

---

[1] Count #22 – robbery of Dollar Tree on March 18, 2013.

1

RRI

walked towards the counter, an individual grabbed him by the back of his shirt and dragged him to the cash register. N.T. 01/30/14, pp. 29-35; N.T. 01/31/14, p. 8.

The assailant, who the jury ultimately determined to be the Appellant, was dressed in all black with a winter mask and sunglasses covering his face. Mr. Andrews testified that based upon the assailant's voice, he determined the robber to be a Caucasian male. He also observed a black object in the assailant's hands. N.T. 01/30/14, pp. 32, 36-41. After being dragged towards the counter, Mr. Andrews was thrown to the ground and hit twice on the side of his head. The assailant said to Mr. Andrews, "Give me the money, pussy. All the money." Mr. Andrews opened the register and handed money and deposit slips to the assailant. N.T. 01/30/14, pp. 35-36. The assailant took approximately $350 to $400. The assailant then jumped over a portion of the counter to exit the store and proceeded to the side of the building towards an alley. N.T. 01/30/14, pp. 38-39. He fled the scene before police arrived. The Commonwealth presented video surveillance footage of the events that occurred in the Lukoil store. Mr. Andrews testified that it appeared from the footage that the black object he had seen in the assailant's hand was a gun. Exhibit C-2; N.T. 01/30/14, pp. 43-44, 57.

Pennsylvania State Trooper Joseph K. Schmidt investigated the August 3, 2012 Lukoil robbery. N.T. 01/31/14, pp. 5-9. He formed the opinion that the assailant must have been either a local resident or employee who was familiar with how the Lukoil operated including who worked there and how many people worked there. State Trooper Schmidt interviewed business owners and residents of the surrounding area including Frank Seglia, the owner of Precision Automotive, an automotive garage located approximately fifty (50) yards from the scene of the crime. In or around April of 2013, after a coordinated effort with other law enforcement, State Trooper Schmidt determined the suspects to be Appellant, John Ferraro, and Bruce Epp. It was

2

RR2

discovered that Frank Seglia was the stepfather of Appellant, and that Appellant had worked for Mr. Seglia at Precision Automotive. N.T. 01/31/14, pp. 10-14, 19-23.

On December 10, 2012, Daniel Johnson and Joshua McCormick were working at the Mail 'n' More shipping store located on Stony Hill Road in Yardley, Bucks County. Due to its close proximity to the Christmas holiday, this date was typically the busiest day of the year and the day where the business had the most amount of cash in the store. N.T. 01/31/14, pp. 31-35. The store, as usual, was set to close at 6:30 p.m. Typically, Mr. Johnson, the store manager, would leave the back door open and wait for a late pickup by UPS. As he waited, Mr. Johnson would close the register drawers at 6:30 p.m. and leave approximately $150 in each register drawer as start-up money for the next business day. He would move the remaining money to a pouch which would be hidden in a secret location for the store owner to find later. N.T. 01/31/14, pp. 35-37; N.T. 02/04/14, pp. 90-93.

On this particular date, Mr. Johnson decided to close the register drawers at 6:15 p.m., fifteen (15) minutes earlier than usual. N.T. 01/31/14, p. 36. He left a total of $400 in the register drawers, moved the rest of the cash to the secret location, and left the back door open. Mr. Johnson and Joshua McCormick waited until 6:30 p.m. whereupon Mr. Johnson went to lock the front door. N.T. 01/31/14, p. 38. As he did this, Mr. McCormick, who was sat near the back counter, observed an individual enter through the back door. N.T. 02/04/14, p. 93. Both Mr. McCormick and Mr. Johnson testified that the assailant, whom the jury ultimately determined to be the Appellant, was dressed in all black. He wore baggie black pants, a black hooded sweatshirt, black shoes, black gloves, and a black balaclava mask which only revealed his eyes. He also carried a backpack. N.T. 01/31/14, pp. 38-42; N.T. 02/04/14, pp. 93-94. Mr. Johnson initially believed the assailant to be a friend, but as he walked closer, he realized that he did not

3

RR3

know the assailant. N.T. 01/31/14, p. 40. Mr. Johnson was able to determine that the assailant was a Caucasian male by observing a sliver of skin near the assailant's neck and the skin near the assailant's eyes. He also observed that the assailant's eyes were a vivid green, which was the assailant's most distinguishing feature. N.T. 01/31/14, pp. 42-45. Mr. Johnson estimated the assailant to be approximately 5 feet 7 inches or 5 feet 8 inches in height. N.T. 01/31/14, p. 45. Mr. McCormick similarly stated that he believed the assailant was 5 feet 8 inches or 5 feet 9 inches tall. N.T. 02/04/14, pp. 97-98.

The assailant pulled his right hand out from his pocket, revealing a black gun with a silver hammer and silver slide release. N.T. 01/31/14, pp. 46-47, 51. He said to Mr. Johnson, "don't be a hero" and then asked Mr. Johnson to fill the backpack. Mr. Johnson then took the backpack and filled it with the approximately $400 of startup money located in the register drawers. The assailant then became emotional and began to apologize, stating that he was being evicted on December 18th and that he had two little girls he had no other means of caring for. N.T. 01/31/14, pp. 51-53. The assailant then asked Mr. Johnson where the rest of the money was, which brought suspicions to Mr. Johnson's mind, leading to a belief that the assailant may have been a former employee. Mr. Johnson told the assailant that there was no more money and that he had just missed the store owner by about ten minutes. The assailant appeared to understand and then exited the store, at which point Mr. Johnson contacted the police. N.T. 01/31/14, pp. 53-54, 58. A recording of Mr. Johnson's police call was played for the jury in which Mr. Johnson states that the assailant was no younger than 25 years of age. Exhibit C-5; N.T. 01/31/14, pp. 54-57. Moreover, in his initial statement to police, Mr. Johnson, a former military policeman in the United States Marine Corps, stated that he believed the assailant's handgun could have been either a 9 millimeter or a .380 caliber auto. N.T. 01/31/14, pp. 32, 46.

4

RR4

When asked whether he knew the Appellant, Mr. Johnson testified that Appellant was a temporary employee at the Mail 'n' More store for approximately two (2) weeks during the Christmas season in either 2009 or 2010. Mr. Johnson had met Appellant once during Appellant's temporary employment. In the days following the Mail 'n' More robbery, Mr. Johnson considered the distinctive eyes and the physical appearance of the assailant. He formed the belief that Appellant could possibly be the assailant because he was the only past employee that came close to fitting the assailant's appearance and would be aware of the busy nature of the store during the time of year the robbery occurred. N.T. 01/31/14, pp. 59-65, 75-78.

Detective John Campbell, of the Lower Makefield Township Police, investigated the December 10, 2012 Mail 'n' More robbery. N.T. 01/31/14, p. 85. After being informed by Mr. Johnson of the statement made by the assailant that he would be evicted on December 18th, Detective Campbell checked through the local courts to see which landlord-tenant proceedings were occurring on December 18, 2012. He then researched the tenants involved to see if they matched the description of the assailant. N.T. 01/31/14, pp. 98-99. Detective Campbell was able to narrow his search to Appellant who had a proceeding on December 18, 2012 along with Alicia Cook. N.T. 02/06/14, pp. 5-6, 11-13. He then learned that Appellant's PennDOT information listed him as being 5'8" tall and having green eyes. Thereafter, Detective Campbell checked the Pennsylvania Firearms Database to see if Appellant had any registered firearms. He discovered that Appellant had a semiautomatic Bersa .380 caliber handgun registered to him, which would commonly be black with shiny accents. N.T. 01/31/14, pp. 103-05. Later in the investigation, Detective Campbell coordinated with other law enforcement officials before arresting Appellant on April 19, 2013. N.T. 01/31/14, pp. 105-06.

RR5

On December 11, 2012, Michael Jervis was working as a cashier at the Lukoil gas station located in Langhorne, Bucks County. He was a friend and co-worker of Evan Andrews, a victim of the August 3, 2012 robbery at the same gas station. N.T. 01/31/14, pp. 127-30. Mr. Jervis was behind the cash register when a male individual, whom the jury ultimately determined to be the Appellant, entered the store dressed in a black hooded sweatshirt, black mask, and gloves. He was wielding a black gun with silver details in his right hand. N.T. 01/31/14, pp. 130-34. The assailant asked for money, so Mr. Jervis opened the cash register and placed the money into a bag the assailant had placed onto the counter. However, the assailant insisted that there was more money, and in fact, there was still money in an extra till set aside for the next shift that would work at the gas station. Mr. Jervis then handed the money from the extra till. N.T. 01/31/14, pp. 135-37. Thereafter, the assailant fled the store, exiting to the right of the building towards a parking lot and a small passage that leads to the back of the building. N.T. 01/31/14, p. 139. Mr. Jervis testified to being approximately 5'10" and believed the assailant to be about the same height. N.T. 01/31/14, pp. 140-41. Also, in his initial contact with the police, Mr. Jervis stated that he believed the assailant to be Caucasian. Exhibit C-7; N.T. 01/31/14, pp. 138-40. Video surveillance footage of the robbery was presented to the jury, which showed the assailant dressed in black. See Exhibit C-8; N.T. 01/31/14, p. 142. In addition, Mr. Jervis testified that he recognized the Appellant to be a customer who had been inside the Lukoil store on previous occasions. N.T. 01/31/14, pp. 143-44.

Officer Thomas DiCampello, a patrol officer with the Langhorne Borough Police Department, was assigned to investigate the December 11, 2012 Lukoil robbery. N.T. 01/31/14, pp. 152-54. Officer DiCampello testified that he was the first officer to arrive on the scene. N.T. 01/31/14, pp. 154-55. Mr. Jervis told Officer DiCampello that the assailant was a Caucasian male

6

RR6

wearing all black, including a black mask that revealed only his eyes, and was approximately 5 feet 8 inches or 5 feet 10 inches in height and of a medium build. N.T. 01/31/14, pp. 155-56. Soon after, Officer Eckenrode of Middletown Township arrived on the scene along with a K-9 officer. The K-9 officer was a dog that specialized in tracking. N.T. 01/31/14, pp. 157-58. In their investigation, Officer Eckenrode and the K-9 officer exited to the right of the Lukoil store towards an alley. The K-9 officer led Officer Eckenrode down an alley towards two businesses directly behind the Lukoil, Amber's Tattoo and Precision Automotive. They lost the track at that location. N.T. 01/31/14, pp. 158-59.

On January 9, 2013, Vishal Patel was working alone in the Subway restaurant owned by his family and located on 545 Oxford Valley Road in Fairless Hills, Bucks County. At approximately 8:30 p.m., Mr. Patel was in the back room when he heard the door buzzer indicating someone had entered the restaurant. Mr. Patel proceeded to the front of the restaurant whereupon he saw an individual dressed in black standing on the employees' side of the sandwich counter. N.T. 01/31/14, pp. 170-73. The assailant, whom the jury ultimately determined to be the Appellant, was wearing a black hooded sweatshirt, black cargo pants, and gloves, and his face was covered with black material revealing only the area around his eyes. Mr. Patel was able to determine that the assailant was a white male and between 5 feet 8 inches and 6 feet in height. N.T. 01/31/14, pp. 176-79. The assailant pointed a gun with a green grip to Mr. Patel's head. During his testimony, Mr. Patel was presented with Exhibit C-4, which he recognized to be the assailant's gun. N.T. 01/31/14, pp. 179-80. The assailant demanded that Mr. Patel give him all of the money that he possibly could. The assailant stated that his house was being taken away that night and that he had no money to pay for his house, which was the reason why he was doing this robbery. After Mr. Patel surrendered the money from the cash register, the

7

assailant demanded more. Mr. Patel opened the store's safe and gave the assailant the money that was located therein. The assailant took approximately $1,100 before he jumped back over the counter and exited to the right of the building. N.T. 01/31/14, pp. 181-83. Video surveillance footage of the January 9, 2013 robbery was presented to the jury. It showed the assailant jump over the sandwich counter, point a gun at Mr. Patel's head, and take money from the register and safe located in the restaurant. See Exhibit C-10; N.T. 01/31/14, pp. 185-88.

As a result of this robbery, Mr. Patel and his father installed a new time-delay safe. Additionally, they acquired a new television in the back room to be able to receive live video streaming from the restaurant cameras and the capability to watch the live video stream on their mobile devices. N.T. 01/31/14, pp. 190-91. On February 23, 2013, Mr. Patel was working along with another employee, 17-year-old Carlos Perez, at the same Subway restaurant located in Fairless Hills, Bucks County. N.T. 01/31/14, pp. 193-94; N.T. 02/04/14, pp. 103-06. At approximately 9:50 p.m., Mr. Perez was in the back room, and Mr. Patel was behind the counter. Mr. Patel observed an individual, whom the jury ultimately determined to be the Appellant, enter through the front door dressed in the same black hooded sweatshirt and black cargo pants that the January 9, 2013 robber was wearing. This assailant also wore material covering his face revealing only his eyes. N.T. 01/31/14, pp. 193-95; N.T. 02/04/14, pp. 106-09.

He proceeded directly towards the entrance to the back room wielding a gun, which Mr. Patel described as the same gun with a green grip used in the first robbery. The assailant demanded that Mr. Patel give him all of the money and told Mr. Perez to lay on the floor. N.T. 01/31/14, pp. 195-97; N.T. 02/04/14, pp. 109-11. He also stated that his kids were hungry, he did not have any money, and he had no other option. N.T. 01/31/14, p. 198; N.T. 02/04/14, p. 112. In addition, Mr. Patel believed it to be the same individual from the January 9, 2013 robbery

because this assailant stated that he was not there to hurt Mr. Patel and asked whether he hurt Mr. Patel the first time. N.T. 01/31/14, p. 198. After Mr. Patel gave the assailant money from the cash register, the assailant demanded more. Mr. Patel entered the password required to open the time-delay safe. The safe began to make a beeping noise, which caused the assailant to believe the police were being alerted. Mr. Patel convinced him that the beeping was coming from the safe. N.T. 01/31/14, pp. 198-202. Mr. Patel gave the assailant the money from the safe and observed that the assailant was speaking into his chest beneath the black sweatshirt. Mr. Patel believed the assailant was speaking into a walkie-talkie and heard him tell the person or persons on the other end to keep an eye out for police. N.T. 01/31/14, pp. 204-05. Mr. Patel, who indicated that he is approximately 5 feet 7 inches tall, testified that the assailant was taller than him, but was unsure of the assailant's exact height. N.T. 01/31/14, pp. 179, 223, 248. In addition, Mr. Patel testified that he recognized the voice of the assailant to be the same as the January 9, 2013 robber. N.T. 01/31/14, pp. 206-07. Video surveillance footage of the February 23, 2013 robbery was presented to the jury. See Exhibit C-12; N.T. 01/31/14, pp. 209-21.

Detective Timothy Fuhrmann of the Bristol Township Police Department was assigned to investigate the January 9, 2013 and February 23, 2013 robberies of the Fairless Hills Subway restaurant. He spoke to the victims of those robberies, Vishal Patel and Carlos Perez, and determined that the assailant was the same individual in both incidents. N.T. 02/06/14, pp. 217-24. During the course of his investigation, Detective Fuhrmann obtained information from a confidential informant. After receiving this information, Detective Fuhrmann researched Appellant through the Pennsylvania Department of Transportation's database. N.T. 02/06/14, pp. 225-27. Detective Fuhrmann determined that the Appellant resided in Levittown, Bucks County and had a 1996 Chevrolet Tahoe registered to his name. N.T. 02/06/14, pp. 228-30. Like

Detective John Campbell who investigated the December 10, 2012 Mail 'n' More robbery, Detective Fuhrmann discovered that Appellant owned a Bersa .380 caliber semiautomatic gun and that Appellant and Alicia Cook had an eviction notice for December 2012.

On February 28, 2013, Cameron Ralston, a 17-year-old high school student, was working alone at the Subway restaurant on 449 Butler Avenue in New Britain, Bucks County. The restaurant closed at approximately 9:00 p.m. Shortly after 9:26 p.m., Mr. Ralston walked outside of the restaurant through the back door to throw away garbage. N.T. 02/04/14, pp. 6-13. As Mr. Ralston opened the door, an individual dressed in black moved towards the doorway. The assailant, whom the jury ultimately determined to be the Appellant, wore a black ski mask, black hooded sweatshirt, black sweatpants, black work shoes, and blue latex gloves. Mr. Ralston testified that the assailant was Caucasian based upon the skin exposed near his eyes. Moreover, Mr. Ralston recalled that the assailant's eyes were green. N.T. 02/04/14, pp. 13-15. He further testified that he was 5 feet 9 inches tall and believed the assailant to be only a little bit taller than himself. He also believed the assailant to be in his mid to late 20s. N.T. 02/04/14, p. 27.

Mr. Ralston saw that the assailant holding a small gun of a shiny dark gray color resembling Exhibit C-4. N.T. 02/04/14, pp. 15-17, 56. The assailant entered the restaurant before telling Mr. Ralston that he was losing his house and that he has two kids to support. He asked Mr. Ralston about the restaurant's safe, but Mr. Ralston did not know the combination. He then asked about the register, and Mr. Ralston explained that it contained less than $100 inside. Finally, the assailant asked about the vehicle in the parking lot, and Mr. Ralston lied and said it was not his. N.T. 02/04/14, pp. 17-19. The assailant and Mr. Ralston then moved to the front of the store. The assailant began talking into his hooded sweatshirt, which led Mr. Ralston to believe the assailant had a walkie-talkie. The assailant informed the person or persons on the

other end that he was in the restaurant and going for the register. Mr. Ralston gave the assailant the money located therein, and then the assailant again asked about the safe. He made Mr. Ralston search for a combination but none was found. The assailant did find a box from which he obtained loose change and a small amount of cash. The two then proceeded to the prep area of the restaurant where the assailant found a set of keys which he took. He also found a scale used to weigh food, and the assailant jokingly said, "this is a nice scale," and chuckled. He did not take the scale. N.T. 02/04/14, pp. 19-21.

The two then moved from the prep area, and the assailant again spoke into what Mr. Ralston believed to be a walkie-talkie, stating that he was ready to go. He then told Mr. Ralston that he had to "wait for his buddy to get gas." As he waited, the assailant continued conversing with Mr. Ralston, asking him whether the manager had an office and telling Mr. Ralston to count to 1,000 before he left. The assailant exited the restaurant, but peeked his head back in and said, "you better be counting." N.T. 02/04/14, pp. 22-23. He again left, but after five seconds, the assailant checked in once again and told Mr. Ralston that he wanted to take Mr. Ralston's phone but decided not to. The assailant then left and closed the door fully. Mr. Ralston waited five minutes before contacting the police at 9:49 p.m. N.T. 02/04/14, pp. 23-25. Video surveillance footage of the robbery was presented to the jury depicting the assailant dressed in black with blue gloves and receiving money from Cameron Ralston. See Exhibit C-15; N.T. 02/04/14, pp. 27-34. During his testimony, the Commonwealth also presented Mr. Ralston with Exhibit C-6, which was a picture of the Appellant. This picture was folded and taped to reveal the area around the Appellant's eyes. Mr. Ralston recognized the eyes to be that of the assailant from the February 28, 2013 robbery. See Exhibit C-6; N.T. 02/04/14, pp. 34-35, 44-45.

11

RR11

On January 31, 2014, during the course of Appellant's jury trial, Cameron Ralston was waiting outside of the courtroom when he heard the statement, "love you too." Mr. Ralston further observed that the voice he heard matched that of the assailant from the approximately twelve (12) minute robbery that occurred on February 23, 2013. He then informed his father and a representative from the District Attorney's office that he recognized the voice. Mr. Ralston identified the Appellant as making the statement outside of the courtroom, but acknowledged that he did not see exactly who made the statement. N.T. 02/04/14, pp. 76-79. Detective Andrew Amoroso of the Middletown Township Police Department testified to having stood outside of the courtroom on the same date and time. He observed the Appellant leave the courtroom and saw a female individual on the 4th floor looking down upon the Appellant. The individual said "I love you" and the Appellant said "I love you too." N.T. 02/04/14, pp. 154-56.

On March 18, 2013, Brandon Drenkhahn was a 19-year-old working at a Dollar Tree store on 1200 Welsh Road in North Wales, Montgomery County along with his 22-year-old assistant manager, Kelley Horn. N.T. 02/04/14, pp. 116-19, 163-64; N.T. 02/07/14, pp. 32-33. The store was located in a shopping center next to a Subway restaurant. Around 10:00 p.m., closing time for the store, Mr. Drenkhahn and Mr. Horn were on their way out of the back door to throw out trash when they were pushed by a male figure dressed in all black. N.T. 02/04/14, pp. 117-21. The assailant, whom the jury later determined to be the Appellant, was wearing a black hooded sweatshirt, black pants, black boots, latex gloves and his face was covered except for his eyes. He was also wielding a gun in his right hand, which was either black or gray in color. Mr. Drenkhahn and Mr. Horn observed that the assailant was a white male based upon some skin that was exposed by the bridge of his nose. N.T. 02/04/14, pp. 121-23, 126, 169-70. The assailant was shorter than Mr. Horn, who is approximately 6 feet 1 inches tall. He estimated

12

the assailant, who had stood directly in front of him, to be approximately 5 feet 10 inches in height. N.T. 02/04/14, p. 170.

The assailant first said, "I don't want to kill you, but I will if I have to." As Mr. Horn and Mr. Drenkhahn reached into their pockets, the assailant stated that he did not need their money because it was theirs and they would not get reimbursed whereas the store would. N.T. 02/04/14, pp. 170-71. The assailant then saw that Mr. Horn and Mr. Drenkhahn were wearing Dollar Tree shirts, and said "Oh, am I in Dollar Tree?" They confirmed that he was, at which point he said the following: "Oh, we were staking this out, I needed to be in Subway, we messed up, but I'm going to have to rob you now because I can't rob them." N.T. 02/04/14, pp. 124-25; N.T. 02/04/14, pp. 171. The Dollar Tree store has two back doors while the Subway restaurant has a separate entrance around the side of the building. Further, these doors were not labeled requiring an individual to know which door belongs to which store in order to enter the correct one. N.T. 02/04/14, pp. 124-25, 165-66; N.T. 02/07/14, pp. 39-40.

As they stood there just inside of the backroom, the assailant pulled back the chamber of his gun and showed Mr. Horn the bullet contained inside and stated that it was not a BB gun. N.T. 02/04/14, pp. 172-73. Mr. Horn and Mr. Drenkhahn began walking towards the front of the store where the money was located, and the assailant told them to crawl. After Mr. Horn asked him why, he stated, "so it wouldn't be on the video cameras." Mr. Horn then explained that there was no camera. The assailant then allowed them to walk while he was behind Mr. Horn with a gun to his back. N.T. 02/04/14, p. 174. Mr. Horn and Mr. Drenkhahn then entered the front office with the assailant leaning against the office door keeping it open. Mr. Horn opened the safe located therein and gave the assailant a bank deposit bag which was to be taken to the bank that night. The assailant stated that he felt bad for having to do this to them, but that he had a

13

family to provide for and he had to pay the electric bill. The assailant then stated that the money in the deposit bag was not enough, so Mr. Horn then gave him rolls of change that were located in the safe. N.T. 02/04/14, pp. 175-79. The two victims and the assailant then moved to the back room. As they were walking, the assailant said he was sorry and that he did not want to have to do this to them. He told Mr. Horn to go home and grab a beer, and that if he had any marijuana, he would have given it to him for causing the problem. He then offered them a little bit of money but they refused. Finally, he asked them to count to "100 Mississippi" before calling the police. He then jumped off the back loading dock and left. The assailant was inside of the store for approximately six to eight minutes. N.T. 02/04/14, pp. 179-80, 184.

Mr. Horn further observed that during the course of the robbery, the assailant had been communicating with other individuals via what he believed to be a walkie-talkie underneath his shirt. The assailant was pressing a button and talking into his shirt, and there was a voice Mr. Horn could hear coming back out. The assailant provided an estimate of the time he would be out of the store to the individuals on the other end. N.T. 02/04/14, p. 180. Mr. Horn also recalled that he had seen the assailant outside dressed in all black earlier in the day at approximately 8:15 p.m. The assailant was stood two stores down near a beer store when he pulled out a cell phone and asked the person on the other end, "why are you making me wait, it's cold out here." N.T. 02/04/14, p. 181. Mr. Horn observed the assailant walk towards a McDonald's restaurant located nearby. Pursuant to a stipulation of the parties, video surveillance footage from the McDonald's restaurant was played for the jury. Mr. Horn believed the individual depicted therein to be the assailant. See Exhibit C-16; N.T. 02/04/14, pp. 181-82. Employees of other nearby businesses also saw a suspicious individual dressed in black clothing fitting the assailant's description walking around for approximately two hours prior to the robbery. N.T. 02/07/14, pp. 45-50.

Additionally, Mr. Horn testified that he had heard the assailant's voice subsequent to the robbery. He stated that on the date of the Appellant's preliminary hearing, he was sat in the lobby when he heard an individual sat across from him ask if he could go outside for a cigarette. Mr. Horn recognized this voice to be that of the assailant's. Mr. Horn further identified the Appellant as the individual who made the statement. N.T. 02/04/14, pp. 197-203.

Detective Edward Davies of the Montgomery Township Police Department was assigned to investigate the March 18, 2013 Dollar Tree robbery. N.T. 02/07/14, pp. 29-33. He was aware of the February 28, 2013 armed robbery of the New Britain Subway restaurant and contacted Detective Corporal Jeffrey Cummins of the New Britain Township Police Department who was assigned to investigate that robbery. After comparing notes, Detective Davies believe there to be a connection between the two incidents. N.T. 02/07/14, p. 51. Detective Davies discovered that on March 17, 2013 at approximately 8:00 p.m., the night before the Dollar Tree robbery, a full-sized Chevrolet Tahoe or Suburban, either burgundy or maroon in color, with two occupants was parked in the lot near the Dollar Tree store. It was a mid-1990s vehicle with wheels that appeared to be upgraded. N.T. 02/07/14, pp. 53-54. In addition, that same evening, an eyewitness saw two white males dressed in all dark clothing including a black hooded sweatshirt, black pants, and dark shoes. N.T. 02/07/14, pp. 56-59. Detective Davies shared the information he gathered with other local police agencies. N.T. 02/07/14, pp. 60-61.

On March 24, 2013, Officer Mark Leonhauser of the Middletown Township Police Department responded to the Dunkin' Donuts business located at 620 West Maple Avenue in Middletown Township, Bucks County. Officer Leonhauser received a call from a silent panic alarm activated by employees of the business. N.T. 01/31/14, pp. 253-55. Officer Leonhauser conducted an investigation and contacted other officers who responded to the scene. Officer

Leonhauser spoke to two employees, Danish Haroon and Gill Farrakh, who indicated that they had been robbed. They described the assailant, whom the jury determined to be the Appellant, as wearing a ski mask and using a handgun. N.T. 01/31/14, pp. 255-57. Detective Andrew Amoroso was assigned to be the lead investigator. He arrived to investigate at the scene the following day. N.T. 02/04/14, pp. 132-34. However, he was unsuccessful in his attempts to locate and speak to Mr. Haroon or Mr. Farrakh. He later learned that neither lived at their last known address any longer. N.T. 02/04/14, pp. 139-42. Regardless, Officer Leonhauser obtained and reviewed video surveillance footage of what occurred in the Dunkin' Donuts. This footage was played for the jury, who determined that a robbery occurred and was carried out by the Appellant. See Exhibit C-13; N.T. 01/31/14, pp. 257-59.

On April 11, 2013, Mukesh Patel was the owner of the Subway restaurant on 449 West Butler Avenue in New Britain, Bucks County. Cameron Ralston, a victim of the February 28, 2013 armed robbery of the same Subway restaurant, was an employee of Mukesh Patel. N.T. 02/04/14, pp. 211-15. At approximately 7:30 p.m., Mr. Patel was training a new employee and cleaning the store. A male individual, whom the jury later determined to be the Appellant, came into the restaurant. He was dressed in black, including a mask and gloves, and held a gun and a bag. Mr. Patel could see skin around the assailant's eyes and was able to determine that the assailant was white. He shouted at Mr. Patel, demanding money and saying that he was in a hurry. Mr. Patel surrendered approximately $1,600 from the register and a small bag below the register. The assailant placed the money inside of the bag he had carried into the restaurant. In addition, he took Mr. Patel's car keys and left before Mr. Patel alerted the police. N.T. 02/04/14, pp. 215-19. The audio recording of Mukesh Patel's phone call to police was played for the jury. Mr. Patel estimated the assailant to be between 20 and 30 years of age. See Exhibit C-17; N.T.

02/04/14, pp. 219-21. Video surveillance footage of the robbery was also presented, which showed the assailant dressed in black. See Exhibit C-18; N.T. 02/04/14, pp. 221-23.

Detective Corporal Jeffrey Cummins was assigned to investigate the February 28, 2013 and April 11, 2013 armed robberies of the New Britain Subway restaurant. N.T. 02/06/14, pp. 26-28. On March 22, 2013, Detective Cummins spoke to Detective Timothy Fuhrmann from the Bristol Township Police Department who was investigating the robberies of the Fairless Hills Subway restaurant. They believed the robberies that occurred at these two locations were committed by the same individual. N.T. 02/06/14, pp. 30-32. Detective Cummins met with Detective Fuhrman as well as other law enforcement officers on March 28, 2013. Based upon the information they shared, they developed a suspect, Appellant Jesse Smoot. Detective Cummins obtained a copy of Appellant's driver's license and learned that Appellant had a 1996 Chevrolet Tahoe registered to his name. N.T. 02/06/14, pp. 37-39. Detective Cummins also learned that Appellant's mother lived in Warrington Township, which borders New Britain Township. N.T. 02/06/14, p. 40.

After the April 11, 2013 robbery of the New Britain Subway location, Detective Cummins decided to investigate where Appellant lived. On April 18, 2013, Detective Cummins drove to Appellant's address. After arriving at approximately 5:15 p.m., he located the front door to Appellant's residence as well as Appellant's registered vehicle. One hour later, he observed a blue Dodge Caravan minivan enter the apartment complex and drive up in front of the Appellant's residence. Through his binoculars, Detective Cummins observed Appellant exit the residence and walk towards the minivan. The Appellant, who was wearing a dark-colored hooded sweatshirt, dark-colored pants, and dark-colored boots, entered the minivan and sat in the front passenger's seat before the minivan exited the apartment complex. N.T. 02/06/14, pp. 41-

17
RR 17

45, 86-87. Detective Cummins followed the minivan to a nearby Sunoco gas station and then back to the apartment. The driver and Appellant entered the apartment and then reemerged five to ten minutes later along with a white female. The detective later learned that the driver's name was Bruce Epp and the female was Mr. Epp's cousin and Appellant's girlfriend, Alicia Cook. Ms. Cook waved goodbye to Appellant and Mr. Epp before they drove from the apartment complex. The detective followed the minivan for a period of time before losing sight of the vehicle at approximately 8:40 p.m. after the vehicle made a sudden U-turn. N.T. 02/06/14, pp. 46-52, 57, 71.

Believing there was about to be an armed robbery, Detective Cummins contacted New Britain Township patrol officers as well as the Horsham Township police. Soon after, a robbery did occur at the Subway location on 303 Horsham Road in Horsham Township, Montgomery County. N.T. 02/04/14, pp. 225-29. Rasik Panchini, the owner of the Subway restaurant, closed the store at approximately 8:45 p.m. He turned off the open sign and all of the lights inside of the restaurant before proceeding towards the door to exit the building. N.T. 02/04/14, pp. 225-29. He opened the door slightly when a male individual put a gun to his forehead. The assailant, whom the jury determined to be the Appellant, demanded that Mr. Panchini give him money. Mr. Panchini asked that the assailant not hurt him because he has children. The assailant responded by saying he also has a family and a wife, which is the reason he needs money. The assailant walked with Mr. Panchini towards the register, and Mr. Panchini gave him the money located therein. Thereafter, the assailant demanded money from the store safe. When Mr. Panchini explained that there was no safe, the assailant claimed that Mr. Panchini was lying. Mr. Panchini then recalled that he had a small box of change and gave that to the assailant. The assailant took a total of approximately $1,500 before kicking Mr. Panchini two or three times. N.T. 02/04/14,

18
RR 18

pp. 229-34, 249. Mr. Panchini, who is 5 feet 4 inches in height, testified that the assailant was taller than himself. He further described the assailant as wearing gloves and a mask that revealed some of the area around his eyes. N.T. 02/04/14, pp. 234-35. However, the restaurant was dark, which prevented Mr. Panchini from being able to see the assailant's skin color. N.T. 02/04/14, pp. 235-43.

Detective James Vincenti of the Horsham Township Police Department was assigned to investigate the Horsham Subway robbery. N.T. 02/06/14, pp. 192-95. He arrived there shortly after 9:00 p.m. and spoke to Mr. Panchini who provided a description of the assailant. N.T. 02/06/14, pp. 194-98. Meanwhile, Detective Cummins was notified of the robbery, which prompted him to return to the Appellant's apartment complex. N.T. 02/06/14, pp. 74-76. It was shortly after midnight on April 19, 2013 that Detective Cummins, who was outside of his vehicle, observed the same minivan he had pursued earlier pull in front of the Appellant's residence. When the interior light of the vehicle came on, the detective observed Bruce Epp was driving and Appellant was sat in the passenger seat. Detective Cummins went back to his vehicle to obtain a bulletproof vest, but by the time he placed it on, Appellant had stepped out of the minivan and entered his apartment. The minivan left the complex, and Detective Cummins followed it to the nearby Sunoco gas station. N.T. 02/06/14, pp. 53-62, 86-87.

After communicating with officers in other townships, Detective Vincenti learned that Detective Cummins had stopped a minivan which contained a suspect in the robbery. Detective Vincenti drove to the scene and found Mr. Epp outside of the vehicle. He approached Mr. Epp and asked him who owned the minivan. Mr. Epp stated that it belonged to his fiancée, Brittany. Detective Vincenti then asked where he had been, and Mr. Epp stated that he had been driving around that night. The detective then said, "Bruce, you know why I'm talking to you." Mr. Epp

19
RR19

began shaking and crying and said that he did not want to get anybody else involved. N.T. 02/06/14, pp. 200-02.

Bruce Epp was taken into custody and transported to the Bristol Township Police Department. N.T. 02/06/14, pp. 200-01. Detective Vincenti observed that Mr. Epp's shoelaces were the only black article of clothing he was wearing. N.T. 02/06/14, p. 205. Mr. Epp was led to an interview room to speak with Detective Vincenti, Detective Cummins, and another investigator, Detective Slemmer. Mr. Epp was read his Miranda rights before confessing. N.T. 02/06/14, pp. 63-67, 200-03. Mr. Epp was taken to the Horsham Township Police Department where he was given his Miranda warnings again and placed under arrest. N.T. 02/06/14, pp. 204-05.

Mr. Epp had known Appellant for approximately ten (10) to twelve (12) years and John Ferraro for approximately fourteen (14) years at the time of trial. Appellant and Mr. Ferraro also knew each other for over ten (10) years. N.T. 02/06/14, pp. 94-98. Shortly before April 11, 2013, Appellant admitted to Mr. Epp that he was committing robberies and asked Mr. Epp to take part in them. In particular, Appellant needed a driver to help him, and Mr. Epp owned a 1993 blue Dodge Caravan minivan. Mr. Epp did not give an answer as to whether he would help or not. On April 11, 2013, Appellant contacted Mr. Epp and requested that he come over to the apartment shared by Appellant and Mr. Epp's cousin, Alicia Cook. When Mr. Epp arrived there, Appellant stated that Ms. Cook was pregnant, they were about to get evicted, and he was "hard up for money." He said he really needed Mr. Epp's help to commit a robbery, and Mr. Epp agreed in order to help his cousin, Ms. Cook. Mr. Epp believed he would be the driver for Appellant. N.T. 02/06/14, pp. 99-104. Through a search on his phone, Appellant found a location to commit the

20

RR20

robbery, and when it was time, he went to his closet and got a gym bag full of clothing and other items. N.T. 02/06/14, pp. 104-06.

Appellant and Mr. Epp entered the blue minivan, and Appellant, who was seated in the front passenger's seat, provided directions as to where they were going. Appellant then climbed into the backseat with his gym bag and changed into all dark clothes including a black coat, a black hooded sweatshirt, black boots, an item to cover his face, and black gloves. As they were driving, Mr. Epp discovered that they were going to a Subway location in Chalfont, Bucks County. N.T. 02/06/14, pp. 106-09, 111-12. They arrived at the location and drove past the Subway towards a housing complex where they eventually parked out of sight of the Subway. They also had two-way radios to communicate with each other in case police arrived, but did not use them during the robbery. Appellant jumped out of the vehicle towards the restaurant, and Mr. Epp pretended to be cleaning the inside of his vehicle. After approximately twenty or twenty-five minutes, Appellant came running back to the minivan, jumped inside, and told Mr. Epp to go. Mr. Epp jumped into the driver's seat and put the vehicle into drive. Appellant provided Mr. Epp directions to go home and also spoke about what occurred inside of the Subway restaurant. Appellant stated that there was a guy and a girl, and that the male would not give up the safe-deposit box so he yanked it from him. In addition, he stated that he grabbed the male's car keys. N.T. 02/06/14, pp. 109-19. After they arrived back at Appellant's residence, Appellant put his bag back in his closet and started counting money with Ms. Cook. Mr. Epp received some money, and Appellant placed the rest of the money in his room. N.T. 02/06/14, pp. 119-20.

Approximately one week later, Appellant contacted Mr. Epp again and stated that John Ferraro, who they referred to as "Jay," was not available to drive for another robbery, so he needed Mr. Epp to drive him again. This was the first time Mr. Epp became aware that Mr.

21

RR 21

Ferraro had helped Appellant. Mr. Epp agreed to assist and drove to Appellant's residence in his blue minivan. After entering the residence, Appellant went to get his bag from his closet. After entering the vehicle, Appellant directed Mr. Epp to enter the address for another Subway restaurant located on 303 Horsham Road into a GPS system belonging to Mr. Epp. Appellant climbed into the backseat to change his clothes. N.T. 02/06/14, pp. 121-25. On the drive, Mr. Epp observed a white SUV had been following his minivan, but it was gone by the time they made a U-turn and arrived at the Subway restaurant in Horsham. They parked in a nearby parking lot and Appellant ran towards the Subway restaurant. Mr. Epp lost view of Appellant who was in the restaurant for approximately twenty or twenty-five minutes. While Appellant was inside, he used the two-way radio that the two brought once again and asked Mr. Epp if "it was clear." Mr. Epp responded that it was, and a short time thereafter, Appellant ran towards the vehicle and jumped back inside. Mr. Epp observed Appellant had a handgun on his lap, which he later identified as being the same gun as Exhibit C-4. N.T. 02/06/14, pp. 126-30.

Appellant changed his clothes in the car before arriving back at the apartment. Upon arrival, he again placed his bag of clothes into his closet. Appellant brought out a safe-deposit box, which he opened and started counting money with Ms. Cook just as he did the prior occasion. N.T. 02/06/14, pp. 130-31. Mr. Epp and Appellant then drove to Mr. Epp's apartment complex to purchase Percocet with the money from the robbery, and both of them used the Percocet soon after. N.T. 02/06/14, pp. 131-33, 186-89. Mr. Epp then took the safe-deposit box to his apartment and left it there before the two then left Mr. Epp's apartment complex and drove back to Appellant's residence. When they arrived, Mr. Epp observed an individual who was walking nearby his vehicle. The individual ran towards his car and put on a bulletproof vest. Appellant then opened the vehicle door, jumped out, and told Mr. Epp to go. Mr. Epp drove to

the nearby Sunoco gas station and observed a white SUV following behind. After arriving at the gas station, Mr. Epp went to pump gas and called Appellant and told him that someone was following him. Mr. Epp heard Appellant over the phone yelling at Ms. Cook to "put the money somewhere." Mr. Epp then observed the white SUV from earlier park nearby. Mr. Epp got into his vehicle and told Appellant that he was about to be arrested. Within seconds, police surround Mr. Epp and pulled him from the vehicle and read him his Miranda rights. N.T. 02/06/14, pp. 131-38. Mr. Epp was taken to the police station where he recalled speaking to Detective Vincenti and Detective Cummins. N.T. 02/06/14, pp. 139-40.

On April 19, 2013 at approximately 8:45 a.m., a SWAT team entered the Appellant's residence and took the Appellant and his girlfriend, Alicia Cook, into custody and transported them to the Bristol Township Police Department. N.T. 02/06/14, pp. 240-43. The Appellant was then led to an interview room to speak with Detective Fuhrmann and Detective Slemmer. Detective Fuhrmann read Appellant his Miranda Rights from a preprinted card, whereupon Appellant confirmed that he understood those rights and consented to questioning without a lawyer present. Appellant signed the card, as did Detective Fuhrmann as a witness, prior to orally confessing to ten robberies. See Exhibit CS-3; N.T. 02/06/14, pp. 245-53.

Detective Fuhrmann began the interview by discussing details of the Fairless Hills Subway robberies. Appellant initially denied knowledge of the robberies, but as the Detective delved into more of the specifics of the individual incidents, the Appellant became visibly upset, crying and shaking. Detective Fuhrmann asked Appellant how many times he robbed the Fairless Hills Subway, to which Appellant responded by raising two fingers. Detective Fuhrmann then confirmed with the Appellant that he robbed the Subway twice, to which Appellant replied "Yeah." N.T. 02/06/14, pp. 255-57. The Appellant then disclosed that there was one Indian male

the first time he robbed the Subway, while there were two people present the second time we went. N.T. 02/06/14, p. 257.

Detective Fuhrmann then detailed information concerning the Dollar Tree robbery, and the Appellant confessed to committing that robbery. Appellant acknowledged that he thought he was going into a Subway, but miscounted the doors. Appellant also admitted to having a conversation with a woman in the parking lot and asking her to move her vehicle as it was blocking his line of sight to the Subway, using the pretense that he was doing surveillance on the Subway looking for a man who was cheating with his wife. Appellant likewise disclosed that he received help from two individuals that he knew from his apartment complex named Quentin and Mishak. This interview was the first time Detective Fuhrmann learned of the details of Appellant's conversation and the existence of these accomplices. N.T. 02/06/14, pp. 258-59.

The Appellant then instructed Detective Fuhrmann to name a place, and he will confirm if he robbed it. N.T. 02/06/14, p. 261. Soon after, Appellant admitted to robbing the Middletown Dunkin' Donuts, but was unaware if he did that job by himself or with a driver. The Appellant commented that the robbery was a spur-of-the-moment thing. N.T. 02/06/14, p. 262. Appellant also confessed to robbing the Horsham Township Subway on April 18, 2013, the night before his arrest. N.T. 02/06/14, p. 262.

By this process, the Appellant further admitted to committing the two robberies of the New Britain Township Subway. Appellant acknowledged that he was driven by John Ferraro and Bruce Epp, and further described how he pressured them into helping with the robberies. N.T. 02/06/14, pp. 263. When prompted, Appellant confessed to the December robbery of the Mail & More, and subsequently volunteered information concerning his involvement in the two robberies of the Langhorne Lukoil. N.T. 02/06/14, pp. 265, 267.

24

RR 24

The Appellant also divulged his modus operandi with respect to the robberies. He would routinely attempt to get his victims to sympathize with him by stating that he was losing his house or mentioning his two daughters. Appellant would make these declarations with the hope that his victims would be less likely to fight back. N.T. 02/06/14, p. 268. Additionally, Appellant confirmed that he would routinely wear dark clothing, which consisted of black pants, a black hoodie, latex gloves, and a mask constructed from the lower portion of a black sweatpant leg cut about 10 inches from the bottom and worn upside down so the elastic would rest at his nose, covering the lower portion of his face. The Appellant cut up his mask and the proceeds from the April 18, 2014 Subway robbery and flushed the remnants down the toilet before the police arrived at his home the following morning. N.T. 02/06/14, pp. 269-71.

The Appellant stated that Bruce Epp drove him when he robbed the Subway the previous night, and Mr. Epp had some money from that robbery. Appellant claimed that John Ferraro would be able to get this money and gave Mr. Ferraro's cell phone number to Detective Fuhrmann with instructions to call and tell him that Appellant requested he bring the money to the Bristol Township Police Department. Appellant then declined to give a written statement to the Detective as he was too tired. N.T. 02/06/14, pp. 271-74.

While Appellant was being interviewed, a search warrant was executed on the Appellant's apartment. During the search, officers recovered a .380 caliber semiautomatic handgun with a neon green grip under a sofa cushion. See Exhibit C-4; N.T. 02/07/14, pp. 109-10. Officers also recovered a sawed-off .22 caliber rifle and a 12-gauge shotgun that had similar lime green grips. N.T. 02/07/14, pp.111-14. A box and instructional manuals for the Bersa handgun were recovered from a living room closet, as was a tupperware-style container housing one Uniden and one Motorola two-way radio. N.T. 02/07/14, pp. 115-117. Additionally, loose

rounds of .380 caliber ammunition, a newspaper article concerning one of the Bristol Township Subway robberies, and a pair of size 12 black boots were found in the Appellant's bedroom. N.T. 02/07/14, pp. 119-27.

At 12:00 p.m., a search warrant was executed on Mr. Epp's blue Dodge Caravan. A Garmin GPS device, a black Dickies jacket, and a gray hooded sweatshirt were all recovered from the vehicle. See Exhibits C-30 and C-31; N.T. 02/06/14, pp. 207. At 12:20 p.m., the Appellant signed a consent form allowing police to search his 1996 Chevy Tahoe. During the course of the search, a leather holster, a dark black or navy wool pullover cap, black wool gloves, and dark blue navy gloves were all recovered. See Exhibit C-35; N.T. 02/07/14, pp. 77-80. The inside of the holster contained wear marks that were a perfect match for the Bersa .380 caliber handgun that was recovered from the Appellant's apartment. N.T. 02/07/14, pp. 81-82.

After the interview with Appellant, Detective Fuhrmann placed a call to the cell phone number that the Appellant communicated to him as belonging to Mr. Ferraro. Detective Fuhrmann relayed that he spoke with Appellant, who wanted Mr. Ferraro to bring the money from the most recent Subway robbery to the Bristol Township Police Department. No more than thirty minutes later, Mr. Ferraro arrived with a shopping bag full of coins and small bills. The bag specifically contains $123 in one dollar bills and $100.50 in various denominations of rolled coins. See Exhibit C-33; N.T. 02/06/14, pp. 275-76.

John Ferraro drove the Appellant on six robberies. Appellant first told Mr. Ferraro that he needed money quickly, as he was losing his apartment and his girlfriend was pregnant. Appellant then asked Mr. Ferraro to be a driver for him as he attempted to commit his robberies. After taking a few weeks to think over the request, Mr. Ferraro agreed to help the Appellant. N.T. 02/06/14, pp. 320-22.

Mr. Ferraro drove the Appellant in the commission of the robbery of two Lukoil Gas Stations, three Subways, and one Dunkin' Donuts store. N.T. 02/06/14, pp. 322-23. Mr. Ferraro first remembered driving Appellant to a Langhorne Lukoil. Mr. Ferraro drove the Appellant to the gas station and parked his white Chevy Tahoe in the parking lot of the nearby auto body shop where the Appellant was previously employed. N.T. 02/06/14, pp. 323-25. The Appellant left the vehicle and headed up the side of the Lukoil store. Appellant was wearing a black hooded sweatshirt, black pants, black boots, and a hat and mask. He later returned to the truck from the Lukoil while still wearing the same clothing. N.T. 02/06/14, p. 326. At a later date, Mr. Ferraro again drove Appellant to the same Lukoil in order to commit a robbery. This second attempt occurred in similar fashion to the first, except the Appellant returned to the truck much quicker than he did previously. Mr. Ferraro returned the Appellant to his own vehicle sometime following the robbery, where he then observed the Appellant sitting and counting money. N.T. 02/06/14, pp. 238-29.

Mr. Ferraro next drove the Appellant to a Subway in the Queen Anne Plaza in Bristol Township. Mr. Ferraro parked on a nearby residential road as Appellant exited the vehicle, running across the street in the direction of the Subway. Again, Appellant was clad in a black hooded sweatshirt, black pants, boots, and a mask. Additionally, Appellant wore blue latex gloves, similar to those that he would wear when Appellant and Mr. Ferraro would work on cars together. N.T. 02/06/14, pp. 330-31. Mr. Ferraro did not observe a gun in Appellant's possession at this time, but assumed that he was had one, as Appellant carried a gun on the previous Lukoil robberies. N.T. 02/06/14, p. 332. Appellant then returned to the truck, and Mr. Ferraro drove them both back to his own house. Appellant explained that he had jumped onto the counter in the Subway and was screaming at the people to get down and hand over all the money. After the job

27

was over, Appellant gave Mr. Ferraro money for gas, as he had with the previous 2 Lukoil robberies. N.T. 02/06/14, pp. 334-34.

After the first Subway robbery, Appellant again confirmed to Mr. Ferraro that he needed more money and further believed it would be a good idea to 'hit' that same Subway again. N.T. 02/06/14, p. 334. So Appellant drove to Mr. Ferraro's house, parked on the driveway next to Mr. Ferraro's truck, then Mr. Ferraro proceeded to drive both to the Queen Anne Plaza Subway. Mr. Ferraro parked on the same residential street across from the Subway as the time before, and again observed Appellant leave the truck in his black hooded sweatshirt, black pants, boots, and mask. Mr. Ferraro also described the Appellant's mask as the bottom portion of a pant leg. N.T. 02/06/14, pp. 335-37. Appellant eventually ran back down the street from the direction of the Subway, entered the passenger seat of the truck, and the two returned to Mr. Ferraro's house. Again, Appellant gave Mr. Ferraro money for gas. N.T. 02/06/14, p. 337.

Mr. Ferraro drove the Appellant to his next target, which was the New Britain Subway. Mr. Ferraro picked up the Appellant at his apartment and proceeded to drive to the Subway store. After parking in an apartment complex across the street from the target, Appellant left the vehicle and headed across the highway to the Subway, again dressed in a black hooded sweatshirt, black pants, black boots, and a mask. N.T. 02/06/14, pp. 338-39. Appellant and Mr. Ferraro stayed in communication during the robbery by use of two walkie-talkies. Mr. Ferraro was able to identify the walkie-talkies recovered from Appellant's home as those that they used during the commission of the robbery. See Exhibit C-29; N.T. 02/06/14, pp. 339-41. Appellant eventually returned to Mr. Ferraro's vehicle and gave him gas money in exchange for his help. N.T. 02/06/14, p. 341.

28

RR 28

The final robbery where Mr. Ferraro drove Appellant was the incident at the Dunkin' Donuts in Langhorne. Mr. Ferraro picked up the Appellant from his home and was originally intending to drive to a Subway located on Street Road before he informed the Appellant that he was too tired to drive the required distance. As a result, Appellant decided to choose an alternate target, being as he still wanted to carry out a robbery. N.T. 02/06/14, pp. 342-43. Appellant decided on the Dunkin' Donuts, and Mr. Ferraro agreed to take him there. Mr. Ferraro parked on a side street past the store, and again, Appellant left the vehicle in the direction of the store while wearing a black hooded sweatshirt, black pants, black boots, and a mask. N.T. 02/06/14, p. 344. As with the previous Subway robbery, Appellant and Mr. Ferraro used walkie-talkies in order to stay in communication. Through the walkie-talkie, Appellant told Mr. Ferraro that he was initially waiting for employees to open the back door so he could enter the building, and after the conclusion of the robbery, he used the walkie-talkie to inform Mr. Ferraro to meet him as he was running from the store. N.T. 02/06/14, pp. 345-46.

Later in the evening after Appellant's final robbery on April 18, 2013, he placed a call to Mr. Ferraro telling him to pick up a bag of money that was left at Bruce Epp's house. N.T. 02/06/14, pp. 347-48. Mr. Ferraro complied with Appellant's request, and later brought this same bag to the Bristol Township Police Station, where he turned it over to Detective Fuhrmann. Detective Fuhrmann then interviewed Mr. Ferraro, who confessed to his involvement in the six robberies with the Appellant. N.T. 02/06/14, pp. 349-52.

Based upon the above evidence, the jury returned a guilty verdict on ten counts of robbery, ten counts of theft by unlawful taking, eight counts of conspiracy, and five counts of terroristic threats. The Appellant was found not guilty of one count of conspiracy in relation to the robbery of the Dollar Tree on March 18, 2013.

## B. Hearing on Pre-Trial Motions/Suppression

At the hearing on Appellant's Motion to Suppress, the following evidence was submitted. Detective Timothy Fuhrmann of the Bristol Township Police Department testified that he was involved in investigating the robberies that occurred at the Subway located at 545 South Oxford Valley Road in Fairless Hills, PA on January 9, 2013 and February 23, 2013. As a result of his investigation, the Detective spoke with the Appellant on April 19, 2013 at the Bristol Township Police Department ("BTPD"). N.T. 01/29/14, pp. 57-59. Detective Fuhrmann aided in the execution of a search warrant on the Appellant's apartment, and afterwards, Appellant was taken back to the BTPD for questioning. Together with his partner, Detective Slemmer, Detective Fuhrmann began his interview with the Appellant at roughly 9:30 AM, not more than ten minutes after they arrived back at the BTPD. N.T. 01/29/14, pp. 59-60; 70. Appellant's handcuffs were removed prior to the start of the interview, and he was not in restraints at any point during the ensuing conversation. N.T. 01/29/14, p. 70.

Detective Fuhrmann first read the Appellant his Miranda warnings from a preprinted yellow rights card that the Department provided. The Detective read him his rights as they were printed on the card, asked Appellant if he understood those rights, and asked if he would like to speak to the Detectives without a lawyer present. N.T. 01/29/14, pp. 61-62. Appellant responded "Yes sir," he understood his rights, and "Yes," he would like to speak without a lawyer present. The Detective memorialized Appellant's exact responses at the bottom of the rights card, dated the card, and signed it as a witness. Appellant also signed the card indicating that he understood his rights and consented to speak without a lawyer present. See Exhibit CS-3; N.T. 01/29/14, pp. 63-64. At no time during the length of the interview did Appellant ask to speak with a lawyer. N.T. 01/29/14, p. 71. Appellant then provided a statement that the Detective transcribed in his

30

handwritten notes during the interview that he eventually incorporated into his written report. In this statement, Appellant admitted to committing ten armed robberies. N.T. 01/29/14, pp. 64-65.

The Detective began the interview by discussing Appellant's vehicle and any firearms that he owned. Appellant confirmed that he owned a Bersa semiautomatic handgun. Appellant then detailed the conversation that he had with Bruce Epp from the night before, where Mr. Epp claimed he was being arrested and that the officers were also going to speak with the Appellant. Appellant initially denied any knowledge as to why the police would seek to question him. However, after the Detective started to explain the circumstances of some of the robberies, Appellant became visibly shaken, began crying, and then gave the Detective further details about the robberies. N.T. 01/29/14, p. 65.

Detective Fuhrmann started discussing the two Subway robberies he was investigating in Bristol Township, as they were most familiar to him. Appellant offered additional details concerning those robberies. The Detective then moved on to the Dollar Tree robbery in Montgomery Township, where he referenced a conversation that the assailant had with a woman in front of that store. Appellant detailed that he approached the woman because she parked her car in Appellant's line of sight a neighboring Subway store. Appellant then proceeded to give details concerning the recent New Britain Township Subway robbery. N.T. 01/29/14, pp. 66-67.

At this point in the interview, the Appellant became more upset and invited Detective Fuhrmann to name the place and the Appellant will confirm whether he committed the robbery. The Detective then referenced robberies of which he was aware. In this manner, Appellant specifically confessed to robbing the Bristol Township Subway twice. He also confirmed that he robbed the Montgomery Township Dollar Tree because he thought it was a Subway. N.T. 01/29/14, p. 67.

At this point in the interview, Detective Fuhrmann stepped out of the room to speak with Detective Campbell of Lower Makefield who informed him of a robbery that occurred at the Mail 'n' More store, where Appellant was a suspect. Detective Fuhrmann approached the Appellant with this robbery, and Appellant admitted his involvement. He specifically indicated that he had been employed there previously, and confirmed that he used his gun to rob the store and gave a description of what he wore and said during the robbery as well. N.T. 01/29/14, p. 68.

Detective Fuhrmann proceeded to question Appellant regarding two other Bristol Township robberies of which he was aware, but Appellant denied any involvement. So the Detective suggested to the Appellant that he divulge any other robberies that he committed. In this manner, Appellant confessed to robbing the Langhorne Lukoil twice, as well as the Middletown Dunkin' Donuts. N.T. 01/29/14, pp. 68-69. The Detective then concluded his interview with the Appellant.

The Detective made specific note of the fact that some of the information that he had gleaned from this interview was information that he had not known prior to Appellant's admission. Particularly, the Detective was not aware of the involvement of men named Quentin and Mishak in the Dollar Tree robbery, or that Appellant had previously been employed by his mother. The Appellant volunteered this information in his statement. N.T. 01/29/14, pp. 167-68.

Detective Fuhrmann confirmed that Alicia Cook was brought to the BTPD for questioning as well, although she was not officially a suspect. Appellant was placed in Interview Room 1, while Ms. Cook was placed in a conference room down the hallway in the detective division. The rooms were not next door to one another. N.T. 01/29/14, pp. 74-75. Detective Fuhrmann had virtually no contact with Ms. Cook that morning, and did not see or hear her crying at any point. N.T. 01/29/14, p. 76-77. Additionally, the Detective confirmed that he did

not instruct Appellant that Ms. Cook could go home after he gave a statement. The Detective was not aware of Ms. Cook's involvement at that time, and did not make any such statement. N.T. 01/29/14, p. 78.

Alicia Cook testified that on the morning of April 19, 2013, the police showed up at her and the Appellant's apartment. The police instructed Ms. Cook to leave the apartment, not allowing her to get changed out of her nighttime attire. N.T. 01/29/14, pp. 81-82. Ms. Cook was then taken to the BTPD in a police car. As the police were leading her to the vehicle, Ms. Cook testified that she was hysterical and Appellant kept telling the officers that she was pregnant and "has nothing to do with this." N.T. 01/29/14, p. 83. When Ms. Cook arrived at the BTPD, she was placed into a room that, she believed, was adjacent to the room where the Appellant sat, as Ms. Cook claims to have heard him say "My girlfriend has nothing to do with this. Please let her go." Ms. Cook confirmed that the room where she was seated did not have a two way mirror. N.T. 01/29/14, p. 96. At the time, Ms. Cook was also crying hysterically, and she claims to have been doing so for the entirety of her interview. Ms. Cook maintains that she was questioned for between an hour and a half and two hours, then released at roughly 11:30 AM or noon. N.T. 01/29/14, p. 84-86.

During her time speaking with the police, Ms. Cook revealed detailed information concerning the events that occurred the evening before, that the Appellant left, came back with Bruce Epp, and that Mr. Epp later called the Appellant. Ms. Cook disclosed information concerning the firearms that the Appellant owned as well. N.T. 01/29/14, pp. 100-04.

The Appellant similarly testified that he was called by an unidentified number early in the morning on April 19, 2013. The voice on the other end instructed the Appellant to leave his residence with his hands held above his head. N.T. 01/29/14, pp. 115-16. Appellant did as he was

instructed. When he opened his door, Appellant saw about 20-30 police and SWAT officers aiming their weapons at him. Multiple officers began screaming orders at him, causing Appellant to feel a great amount of stress. He walked backwards down the ramp in front of his apartment, dropped to his knees, and then he was "slammed to the ground very violently." N.T. 01/29/14, pp. 117-19. As the Appellant had his hands bound with zip ties and was being ied to a SWAT truck, he recalls yelling at the officers then entering his home that his girlfriend was pregnant. The Appellant was then taken to the BTPD. N.T. 01/29/14, pp. 120-22.

When the Appellant arrived at BTPD, he was made to stand in a hallway near the interview room for roughly 15 minutes. He asserts that while standing, various detectives approached him, questioning him and telling him "that they know this and they know that." N.T. 01/29/14, pp. 122-23. Then, a detective removed the zip ties from his hands and brought Appellant into the interview room. While sitting in the room, Appellant claims that he could hear Ms. Cook "crying, weeping, saying that she did not know anything." N.T. 01/29/14, p. 124.

Appellant recalls pleading with the detectives to let Ms. Cook go. However, according to Appellant, the questioning detective informed him that he needed to give the detectives what they want. Appellant believes that the Detective then slid him the Miranda card and told him to sign it so that they can keep talking. Appellant responded that "I will do whatever you want me to do," and signed the card. N.T. 01/29/14, pp. 124-26. Appellant claims that he was distraught at that point and would have signed anything. As the interview progressed, the detective still told Appellant that he would let Ms. Cook go, but Appellant must keep working with him. N.T. 01/29/14, p. 126.

Appellant also quarreled with some of the information contained in Detective Fuhrmann's report of the interview as being inaccurate. Appellant claims that he never said that Bruce Epp

34

was his cousin, as that is not true, and he further alleges that the Detective did not read him his rights at any point during the conversation. N.T. 01/29/14, pp. 132-34. The Appellant does confirm, however, that he spoke with the detectives while knowing what his rights were, but he only did so as he believed Ms. Cook would then be sent home. N.T. 01/29/14, p. 163.

Based on the foregoing evidence as applied to <u>Miranda v. Arizona</u>, 86 S.Ct. 1602 (1966) and its progeny, we denied Appellant's Motion to Suppress for reasons we will set forth in detail below.

## PROCEDURAL HISTORY

On April 19, 2013, Lower Makefield Township Police arrested and charged the Appellant with Robbery and related offenses. Between April 22, 2013 and May 7, 2013, various Police Departments throughout Bucks and Montgomery Counties similarly charged the Appellant in connection with seven other criminal informations. On February 7, 2014, a jury found the Appellant guilty of ten (10) counts of Robbery,[2] ten (10) counts of Theft by Unlawful Taking,[3] eight (8) counts of Criminal Conspiracy,[4] and five (5) counts of Terroristic Threats.[5] Sentencing was deferred for a Pre-Sentence Investigation and the performance of a Mental Health Evaluation.

On June 20, 2014, the Appellant was sentenced to serve not less than 28 years, nor more than 70 years, in a State Correctional Institution and a term of 55 years probation to be served concurrently with the Appellant's incarceration. On June 27, 2014, the Appellant filed Post-Sentence Motions with the Court, which were denied on October 17, 2014. Appellant timely filed an appeal to the Superior Court on October 31, 2014.

---

[2] 18 Pa.C.S.A. § 3701(a)(1)(iv).
[3] 18 Pa.C.S.A. § 3921(a).
[4] 18 Pa.C.S.A. § 903(a).
[5] 18 Pa.C.S.A. § 2706(a)(1).

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

On October 31, 2014, the date Appellant filed his original Notice of Appeal, Appellant also filed a Concise Statement of Matters Complained of on Appeal. On November 12, 2014, Appellant filed an Amended Notice of Appeal. On December 1, 2014, we issued an Order pursuant to Pa.R.A.P. 1925(b) requiring Appellant to file a concise statement. On December 11, 2014, Appellant filed an amended Concise Statement of Matters Complained of On Appeal. We offer our analysis pursuant to Appellant's latest concise statement, which raised the following issues, *verbatim*:

i.  The Court erred in not granting Defendant [*sic*] motion to sever the ten robbery cases, as evidence in one case not admissible in others, and the prejudicial effect of the Court joining the cases for trial constituted and [*sic*] abuse of the Court's discretion and denied the Defendant a fair trial.

ii. The Court erred in allowing the Commonwealth to introduce evidences [*sic*] of an alleged voice identification where the alleged voice identification was not consistent with the Commonwealth's offer of proof for the same and where the witness stated that he was not able to identify the Defendant's voice as the voice he heard at the time of the robbery, in which he was a victim, and the admission of this evidence, under circumstances, at trial, was irreparably prejudicial to the Defendant, denied him a fair trial and constitutes an abuse of the Court's discretion.

iii. The Court erred in not granting the Defendant's Motion for mistrial where the Commonwealth introduced and [*sic*] alleged voice identification which was bungled and not a true voice identification, after which the commonwealth called detective Amoroso to testify, over the strenuous objections of the defendant, that the voice that the alleged victim heard was the Defendant's voice, in attempt to rehabilitate the commonwealth [*sic*] botched voice identification.

iv. The Court erred in denying the Defendant's Pretrial motion to suppress his statement which was not a knowing, voluntarily [*sic*], and intelligent act.

v.  The Court erred in denying the Defendant's Pretrial motion for continuance where the Court permitted new counsel to enter on behalf of the Defendant to represent him at trial, but only allowed new counsel twelve days to be ready to try a case involving ten different alleged arm [*sic*] robberies and where on the day of trial Defense counsel candidly advised the Court that he was not prepared to properly litigate the Defendant's claims and defend him at trial, this amounted to an abuse of the Court's discretion.

vi.  The Court erred in allowing police officer evidence to be admitted at trial where the police officers and detectives, [*sic*] improperly offered their opinions that the person who had committed one robbery had committed all ten robberies, as this evidence was highly prejudicial, constituted an abuse of the Court's discretion, and denied the Defendant a fair trial.

vii. The Court erred in allowing police officer evidence to be admitted at trial where the police officers and detectives, [*sic*] improperly offered their opinions that the Defendant was the robbery suspect one robbery [*sic*] and that he had committed all ten robberies, as this evidence and conclusion, was for the jury's determination, as this was the ultimate issue, [*sic*] in the case, and the Court by allowing the police officers to offer their opinions allowed the Commonwealth to invaded [*sic*] the province of the jury, thus denying the Defendant a fair trial.

viii. The Court erred in allowing the Prosecutor to argue to the jury that there were other robberies that had occurred that the Defendant had not been charged with, thereby implying that the Defendant had committed other robberies, in an attempt to unfairly prejudice the jury against the Defendant, and the Defendant should have been granted a "mis-trial".

ix.  The Commonwealth improperly argued to the jury, during closing argument, essentially that the jury had to determine that police officers, who investigated the robberies and testified at the trial, were corrupt or the jury had to find the Defendant guilty, which is not the legal standard to be applied in a criminal case.

x.   The Defendant made various motions for mistrials, as a result of errors committed by the Court, and improper and impermissible evidence presented by the Commonwealth, which affected the outcome of the trial, resulting in the jury finding the Defendant "guilty" and the trial Court erred in denying the Defendant's motions for mistrial.

xi.  There was insufficient evidence from which the jury could conclude beyond a reasonable doubt that the Defendant committed each and every robbery with which he was charged where the evidence was that the "Subway" robbery was committed by a "black man" and Defendant Jesse Smoot is Caucasian.

xii. The Defendant has newly discovered evidence in that he has an alibi for the robbery that occurred on February 23, 2013, at the Subway in Levittown where Kathleen Moser will testify that he was with her at the time of the alleged crime, and this evidence is sufficient to change the outcome of his case, and as a result [*sic*] a jury could find the Defendant "not guilty" at trial.

xiii. The trial Court erred in allowing the Commonwealth to introduce evidence and records, at trial, through police officers, that the Defendant was behind in his rent and had a landlord Tenant hearing hearing [*sic*] scheduled or [*sic*] December 19, 2012, which the prosecutor asserted was a motive for the Defendant robbing the Mail N More and other business establishments.

37

RR37

xiv. The Trial Court erred in allowing the Commonwealth to introduce to the jury evidence of prior bad act [sic] allegedly committed by the Defendant to which the defendant objected and the Court erred in not granting the Defendant's Motion for mistrial.

xv. The prosecutor committed misconduct by eliciting evidence of prior bad acts and introducing that evidence before a jury when that evidence was irrelevant, highly prejudicial and denied the Defendant a fair trial.

xvi. The trial Court erred and abused its discretion in not granting the Defendant's Motion for Judgment of Acquittal with regards to Dunkin Donuts robbery where there were no witnesses called by the prosecutor to the [sic] offer evidence that the Defendant robbed, [sic] the Dunkin Donuts.

xvii. The trial Court erred and abuse [sic] its discretion in allowing an alleged voice identification by Cameron Ralston, the victim of one the [sic] robberies, where the alleged voice identification was not a true voice identification and was improperly introduced for the sole purpose of prejudicial [sic] the Defendant.

xviii. The prosecutor committed misconduct by eliciting evidence and suggesting to jury that the Defendant committed the ten (10) robberies so that he could by [sic] drugs or support his drug habit, where there was no credible evidence introduced to support the Commonwealth's contention.

xix. The Defendant was denied a fair trial and the Commonwealth committed misconduct by withholding the fact, until the Defendants' sentencing, that it had negotiated a deal and sentence with Commonwealth witnesses Bruce Epps and/or John Ferraro, in return for their cooperation, at trial, hereby allowing its principal Commonwealth witnesses, the Co-Defendants, to testify falsely at the Defendant's trial.

xx. The Commonwealth violated the federal and state law, adopted by the Courts, in Brady v. Maryland, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194, (1963)by [sic] acting in bad faith and failing to disclose its deal with the Co-Defendants.

xxi. As a result of the Commonwealth's failure to disclose its negotiated deals to the Defendant and the Commonwealth's efforts to hide them, as required by Brady, the Defendant is asking the Court to arrest the verdicts and judgment herein, and discharge the Defendant. See Commonwealth vs. Jay C. Smith, __ Pa.__ (September 18, 1992); Commonwealth vs. Simons, 514 Pa. 10, 16, 522 A.2d 537, 540 (1987); Oregon vs. Kennedy, 456 U.s. [sic] 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

xxii. On June 20, 2014, the Defendant was sentenced to an aggregate sentence of 28 years to 70 years, incarceration in a state correctional institution, with 55 years of probation, to run concurrent with the sentence of incarceration. The sentence is excessive and harsh, as the offenses for the Defendant was sentenced [sic], constitute a first offense, since all convictions occurred on February 7, 2014, at the conclusion of a single jury trial and the Defendant had no prior adult convictions or juvenile adjudications which would justify such a sentence.

xxiii. The sentence is excessive and exceeds the statutory maximum for robbery, as the offenses for the Defendant was sentenced [*sic*], constitute a first offense, since all convictions occurred on February 7, 2014, at the conclusion of single jury trial and the Defendant had no prior adult convictions or juvenile adjudications which would justify such a sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

Appellant contends that the evidence presented at trial was not sufficient to sustain the jury's verdict. We demonstrate herein that the Commonwealth presented sufficient evidence to the jury to prove beyond a reasonable doubt that Appellant committed the crimes of which he was convicted.

The Pennsylvania Supreme Court has articulated that the well-settled standard of review in judging the sufficiency of the evidence is whether, when viewing the evidence in a light most favorable to the Commonwealth as the verdict winner and drawing the proper inferences favorable to the Commonwealth, the trier of fact could reasonably have found that all of the elements of the crime were established beyond a reasonable doubt. Commonwealth v. Hagan, 654 A.2d 541, 543 (Pa. 1995); Commonwealth v. Heberling, 678 A.2d 794, 795 (Pa. Super. 1996). The Superior Court has elaborated:

> In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

> The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Commonwealth v. Ventrini, 734 A.2d 404, 406-07 (Pa. Super. 1999) (citations omitted). Clearly, in finding Appellant guilty of ten counts of robbery, ten counts of theft by unlawful taking, eight counts of conspiracy, and five counts of terroristic threats, the jury believed the testimony of the Commonwealth's witnesses and accepted the Commonwealth's evidence to the extent it established beyond a reasonable doubt the elements of these offenses. Based on the foregoing facts and in viewing the facts most favorable to the Commonwealth, it is apparent that the Commonwealth presented sufficient evidence to the jury to prove beyond a reasonable doubt that Appellant committed the offenses.

### A. Robbery

Pursuant to 18 Pa.C.S.A. § 3701(a)(1)(iv), a person is guilty of committing robbery if in the course of committing a theft, he inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury. In the "course of committing a theft" has been construed to mean both an attempt to commit a theft or in the flight after the commission of a theft. Commonwealth v. Ford, 650 A.2d 433, 437 (Pa. 1994). An individual commits theft when he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof. 18 Pa.C.S.A. § 3921(a). Moreover, there does not need to be any verbal threat or utterance in order to sustain a robbery conviction. Commonwealth v. Hopkins, 747 A.2d 910, 914 (Pa. Super. 2000). "The threat posed by the appearance of a firearm is calculated to inflict fear of deadly injury, not merely fear of "serious bodily injury." . . . A factfinder is entitled to infer that a victim was in mortal fear when a defendant visibly brandished a firearm." Id. at 914-915.

Appellant was convicted of one count of robbery in connection with each of ten different incidents, resulting in a total of ten robbery convictions. Each conviction will be discussed individually below.

The evidence in the light most favorable to the Commonwealth was sufficient to support the jury's finding that Appellant robbed the Langhorne Lukoil on August 3, 2012. The jury first heard testimony from Mr. Andrews that an individual dressed in all black entered the Lukoil, pointed what appeared to be a gun at him, struck him twice in the head, and stole roughly $350 to $400 from the store. N.T. 01/30/14, pp. 31-39, 57. Security camera footage from that day confirmed Mr. Andrews' recollection of these events. See Exhibit C-2B. The evidence supports the finding that a robbery occurred at the Lukoil, being as the assailant caused bodily injury to Mr. Andrews while unlawfully taking money from the store.

There was likewise enough evidence for the jury to determine that Appellant was the individual who committed the robbery. Mr. Andrews' testimony and the surveillance footage from the Lukoil established that the assailant wore dark clothing, a mask, had an object later identified to be a gun, and that he jumped over the counter. Mr. Andrews could confirm that the assailant was a Caucasian male by the sound of his voice. N.T. 01/30/14, pp. 31-38. After the commission of the robbery, the assailant fled the store to the right, which led down an alley toward a mechanic's garage behind the Lukoil. N.T. 01/30/14, pp. 39. John Ferraro corroborated Mr. Andrews' testimony by confirming that he drove Appellant to the Lukoil on two separate occasions for the purpose of committing a robbery. N.T. 02/06/14, p. 323. Mr. Ferraro further recalled parking his vehicle in the auto garage's parking lot, seeing Appellant leave his vehicle clad in all black attire, head up the alley toward the front of the Lukoil, and later return down that same alley. N.T. 02/06/14, p. 325-26. Additionally, in his interview with Detective Fuhrmann,

41

RR41

Appellant also admitted himself that he robbed the Langhorne Lukoil two separate times and that he always wore all black clothing. N.T. 02/06/14, pp. 267, 269-70.

The record similarly indicates that there is sufficient evidence to support the jury's finding that Appellant committed the December 10, 2013 robbery of the Mail 'n' More shipping store in Yardley, Bucks County. Daniel Johnson and Joshua McCormick observed an individual enter through the back door of the store dressed in all black. N.T. 01/31/14, pp. 38-42. This individual demanded money from the two employees at gunpoint, and left the store with roughly $400 that belonged to the Mail 'n' More. N.T. 01/31/14, pp. 52-53. This testimony is sufficient to establish that a robbery occurred, as the assailant brandished a firearm in the course of unlawfully taking money from the store.

The evidence further establishes that the Appellant was this assailant. Mr. Johnson testified that the assailant was a Caucasian male, standing about 5 feet 7-8 inches tall, with vivid green eyes. N.T. 01/31/14, pp. 45-46. This description matches the Appellant. Mr. Johnson also reported that the assailant carried a .9 millimeter or .380 caliber handgun that was black with silver accents and identified the handgun recovered from Appellant's home as looking 'exactly' like the weapon that the assailant used. N.T. 01/31/14, pp. 46-51. During the robbery, the assailant communicated that he was being evicted on December 18, 2012, and official records indicate that Appellant had a landlord-tenant proceeding scheduled for that date. See Exhibit C-21; N.T. 01/31/14, p. 53. Appellant also disclosed to Detective Fuhrmann at a later date that he would often claim to be losing his home during robberies in order to evoke sympathy from his victims. N.T. 02/06/14, p. 268. This assailant was clad in black pants, black hooded sweatshirt, black shoes, black gloves, and a black mask, which matches what Appellant admitted he wore in the commission of all of his robberies. N.T. 01/31/14, pp. 38-42; N.T. 02/06/14, pp. 269-70.

42

RR 42

Finally, Appellant admitted to Detective Fuhrmann that he was a former employee at the Mail 'n' More and confessed that he had robbed the store in December. N.T. 02/06/14, p. 265.

The record likewise indicates that the evidence was sufficient to support Appellant's conviction in the December 11, 2012 robbery of the Langhorne Lukoil. Michael Jervis testified that an individual entered the Lukoil store on that day dressed in all black, brandishing a gun in his right hand. This assailant forced Mr. Jervis to empty the register and a side till containing extra money, and then left the store and proceeded down the side alley in the direction of an auto shop. N.T. 01/31/14, pp. 130-37, 139. The surveillance footage from that night corroborates Mr. Jervis' testimony. See Exhibit C-8. The evidence supports that a robbery occurred, being as the assailant brandished a firearm while unlawfully taking money from the Lukoil store.

The evidence further supports the jury's finding that the Appellant was this assailant. The assailant wore all black clothing, including a hooded sweatshirt, mask, and gloves, which Appellant confessed he wore on each of his robberies. N.T. 02/06/14, pp. 269-70. Mr. Jervis communicated that the assailant was a Caucasian male who stood about 5 feet 8-10 inches in height, and who he recognized as being a customer of the store. N.T. 02/06/14, pp. 155-156. Appellant's mother confirmed that Appellant was a customer of that Lukoil store. N.T. 02/07/14, pp. 193-94. Mr. Ferraro corroborated Mr. Jervis' testimony by confirming that he drove Appellant to that Lukoil on two distinct occasions for the purpose of committing a robbery. N.T. 02/06/14, p. 323. Mr. Ferraro further recalled Appellant was dressed in all black, and that he parked his vehicle in the auto garage's lot behind the store, which is the same location where the K-9 unit lost track of the assailant after the robbery. N.T. 02/06/14, pp. 325-26; N.T. 01/31/14, pp. 158-59. Appellant also confessed that he robbed the Langhorne Lukoil two separate times in an interview with Detective Fuhrmann. N.T. 02/06/14, p. 267.

The evidence introduced at trial is sufficient to support the jury's finding that Appellant committed the January 9, 2013 robbery of the Subway in Fairless Hills, Bucks County. Vishal Patel testified that an individual entered the Subway that evening dressed in all black and demanded money. This assailant jumped over the front counter, put a gun to Mr. Patel's head, and eventually left the store with approximately $1,100 of money from the register and safe. N.T. 01/31/14, pp. 173-83. Surveillance footage from that night corroborates Mr. Patel's testimony of the robbery. See C-10B; N.T. 01/31/14, p. 185-186. As this assailant used a threat of violence by brandishing a firearm and pointing it at the victim's head during the course of unlawfully removing money from the Subway's register and safe, a robbery was committed.

The evidence introduced further supports a finding that this assailant was the Appellant. The assailant was dressed in a black hooded sweatshirt, black cargo pants, gloves, and a covering for his face, which Appellant admitted he wore in the commission of his robberies. N.T. 02/06/14, pp. 269-70. Mr. Patel identified the assailant as a Caucasian male standing between 5 feet 8 inches and 6 feet tall, a description which the Appellant fits. N.T. 01/31/14, pp. 178-79. Mr. Patel also was able to identify the gun found in Appellant's home as the same one that the assailant pointed at his head. See Exhibit C-4; N.T. 01/31/14, pp. 179-80. Mr. Ferraro also confirmed that he drove Appellant to that Subway on two separate occasions for the purpose of committing a robbery, and Appellant wore all black clothing when he left and re-entered the vehicle. Mr. Ferraro further testified that the Appellant recalled to him some of the details of his interaction with the victim inside the store. N.T. 02/06/14, pp. 330-33. Appellant also confessed to Detective Fuhrmann that he robbed the Fairless Hills Subway twice. N.T. 02/06/14, pp. 255-257.

There was also sufficient evidence to sustain Appellant's conviction in the February 23, 2013 robbery of that same Subway in Fairless Hills, Bucks County. Mr. Patel and Carlos Perez testified that an individual dressed in all black entered the store, brandishing a gun in his hand. N.T. 01/31/14, pp. 194-97. The assailant made Mr. Patel empty the register and the safe, then left the store by the back door. Surveillance video from the Subway confirm Mr. Patel and Mr. Perez's recollections of the robbery. See Exhibit C-12; N.T. 01/31/14, pp. 198-99, 209-10. Together, the testimony and video evidence establish that a robbery occurred, as the assailant brandished a firearm in the act of unlawfully taking money from the Subway.

The evidence in the light most favorable to the Commonwealth likewise establishes that the Appellant was this assailant. The assailant dressed in all black, just like the previous robbery of that Subway, and just as Appellant admitted that he did in each robbery. N.T. 02/06/14, pp. 269-70. Mr. Patel was able to identify the gun that the assailant held as exactly the same gun that was pointed at his head in the first robbery in January, and further identified the gun recovered from Appellant's apartment as that same weapon. See Exhibit C-4; N.T. 01/31/14, pp. 179-80. The assailant also asked Mr. Patel during the robbery if he "hurt you the first time," which Mr. Patel took to reference the prior robbery. N.T. 01/31/14, pp. 196-98. In the commission of this robbery, the assailant seemed to be using a walkie-talkie that he kept under his sweatshirt. N.T. 01/31/14, p. 204. Two walkie-talkies were found in Appellant's home, which Mr. Ferraro was able to positively identify as those that he and Appellant used in the commission of several robberies. See Exhibit C-29; N.T. 02/06/14, p. 340. Mr. Ferraro also admitted to driving Appellant to this Subway for the purpose of committing a second robbery, and Appellant himself confessed to Detective Fuhrmann that he robbed this Subway on two occasions. N.T. 02/06/14,

45
RR45

pp. 334-37, 256-57. Appellant even detailed that there were two employees there for the second robbery, compared to only one being present in the first instance. N.T. 02/06/14, p. 257.

The evidence introduced is similarly sufficient to sustain Appellant's conviction in the February 28, 2013 robbery of the New Britain, Bucks County Subway. Cameron Ralston testified that a man entered the Subway that evening dressed in all black, brandishing a gun. N.T. 02/04/14, pp. 13-16. The assailant then made Mr. Ralston convey the contents of the register before leaving the store. N.T. 02/04/14, pp. 20-24. Surveillance video confirms Mr. Ralston's testimony concerning the events of that night. See Exhibits C-15A, C-15B. As the assailant brandished a gun while unlawfully taking money from the Subway, the jury could properly find that a robbery was committed.

The evidence further shows that the Appellant was this assailant. Mr. Ralston testified that the assailant wore a black hoodie, black sweatpants, black work shoes, a mask, and blue latex gloves, which corresponds to Appellant's admitted attire that he wore during his robberies. Likewise, the assailant referenced to Mr. Ralston that he was losing his house and he had two children to support, which, was something that the Appellant admitted he told his victims in order to gain sympathy. N.T. 02/06/14, pp. 268-270. As a result of his extended conversation with this assailant for approximately twelve minutes during the robbery, Mr. Ralston was later able to positively identify Appellant's voice as that of his assailant. N.T. 02/04/13, pp. 76-79. Mr. Ralston could also identify certain physical attributes of his assailant, namely that he was a Caucasian male, mid to late twenties, with green eyes, and appeared to stand slightly taller than his own height, 5 feet 9 inches. N.T. 02/04/14, pp. 14-15, 27. Mr. Ralston then confirmed that the assailant used a walkie-talkie to communicate with an unknown individual outside of the restaurant, which Mr. Ferraro corroborated in his testimony. N.T. 02/04/14, pp. 19-20; N.T.

46

RR46

02/06/14, pp. 339-340. Mr. Ferraro also identified the walkie-talkies found in Appellant's home as those used during this robbery. See Exhibit C-29. Mr. Ferraro was further able to confirm that he did drive Appellant to the New Britain Subway for the purpose of committing a robbery, and additionally verified that Appellant wore the same black hoodie, black pants, and black boots as Mr. Ralston referenced. N.T. 02/06/14, pp. 337-39. And finally, Appellant confessed to Detective Fuhrmann that he did commit two robberies at this Subway, and further detailed that he pressured Mr. Ferraro into helping him in the commission of this first robbery. N.T. 02/06/14, pp. 262-63.

The evidence in light most favorable to the Commonwealth is also sufficient to support Appellant's conviction in connection with the March 18, 2013 robbery of the Dollar Tree in North Wales, Montgomery County. Brandon Drenkhahn and Kelley Horn observed an individual dressed in all black enter the Dollar Tree as they were attempting to take trash out the back door. N.T. 02/04/14, pp. 117-21. This individual, armed with a gun, threatened "I don't want to kill you, but I will if I have to," before pulling back the chamber of the gun to show the victims that there was a bullet loaded inside. The assailant then forced the two to open the store safe and hand over the contents before he left the store. N.T. 02/04/14, pp. 170-73, 177-80. As this assailant threatened Mr. Drenkhahn and Mr. Horn with his gun as he was unlawfully taking money from the Dollar Tree, the jury could find that a robbery was committed.

The evidence was sufficient for the jury to properly find that the Appellant was this assailant. This assailant was described as a Caucasian male, who measured roughly 5 feet 10 inches in height. N.T. 02/04/14, pp. 169-70. The two victims observed that the assailant wore a black hooded sweatshirt, black boots, a mask, and latex gloves, which matches Appellant's admitted attire that he wore during each robbery. N.T. 02/04/14, p. 169; N.T. 02/06/14, pp. 269-

70. Mr. Drenkhahn and Mr. Horn also reported that the assailant told them that he did not intend to rob the Dollar Tree, but rather meant to rob the neighboring Subway, ultimately confusing the unmarked doors. They also recalled that the individual used what appeared to be a walkie-talkie underneath his shirt in order to communicate with an unknown individual outside of the store. N.T. 02/04/14, pp. 171, 180. Additionally, immediately before Appellant's preliminary hearing, Mr. Horn heard the Appellant in the lobby ask to go out for a cigarette and recognized the voice as belonging to the assailant of the Dollar Tree. N.T. 02/04/14, pp. 197-203. And lastly, during his interview with Detective Fuhrmann, Appellant himself admitted that he robbed the Dollar Tree accidently, meaning to enter the Subway, and that he committed this robbery with the help of two African American men that he knew from his apartment complex named Quentin and Mishak. N.T. 02/06/14, pp. 259-61.

Sufficient evidence was presented to support Appellant's conviction in March 24, 2013 robbery of the Dunkin' Donuts in Langhorne, Bucks County. Officer Leonhauser testified that he responded to a silent panic alarm at the Dunkin' Donuts, where two employees had reported that they were robbed at gunpoint by a masked individual. N.T. 01/31/14, pp. 255-57. The report of a robbery was confirmed by the store's video surveillance system. See Exhibit C-13B. Detective Amoroso attempted to locate the victims, but they did not live at their last known addresses and could not be found, so they were unavailable for trial. N.T. 02/04/14, pp. 139-42. Still, Officer Leonhauser's testimony coupled with the details of the surveillance video provide sufficient evidence that a robbery was committed, as the assailant used threats of force by brandishing a firearm in his theft of the Dunkin' Donuts.

There is likewise sufficient evidence to support the jury's finding that the Appellant was this assailant. The video surveillance showed that the assailant wore a mask and gloves, and

48
RR48

carried a firearm, which is consistent with Appellant's admitted method of operation. See Exhibit C-13B. Mr. Ferraro admitted that he drove Appellant to the Dunkin' Donuts for the purpose of committing a robbery. However, Mr. Ferraro testified that Appellant originally wanted him to drive to a Subway restaurant on Street Road, but Mr. Ferraro didn't want to drive that far, as he was too tired. So as they passed the Dunkin' Donuts, Appellant decided to rob this store instead of the Subway. N.T. 02/04/14, pp. 342-44. Mr. Ferraro confirmed that Appellant was again wearing a black hooded sweatshirt, black pants, black boots, and a mask, and that they once more used walkie-talkies for communication. N.T. 02/04/14, p. 345. In his interview with Detective Fuhrmann, Appellant also confessed to robbing the Dunkin' Donuts and further stated that it was a spur-of-the-moment decision, which matches Mr. Ferraro's testimony claiming that Appellant changed his target to the Dunkin' Donuts as they were driving. N.T. 02/06/14, p. 262.

Sufficient evidence was presented to support the jury's finding that a robbery occurred on April 11, 2013 at the New Britain, Bucks County Subway. Mukesh Patel observed an individual dressed in all black and armed with a gun enter his Subway store that evening. This assailant demanded money, and Mr. Patel ultimately surrendered $1,600 and his personal car keys to the assailant before he left the store. N.T. 02/04/14, pp. 215-18. Video surveillance footage from the Subway corroborates Mr. Patel's recollection of that night. See Exhibit C-18. As this assailant brandished a firearm while acting to unlawfully take money from the Subway, a robbery was committed.

There was likewise sufficient evidence to support the jury's finding that the Appellant was this assailant. The assailant was a Caucasian male who Mr. Patel estimated was between twenty and thirty years of age. This assailant wore all black, including a mask and gloves, carried a gun, and jumped over the counter towards the register, which is all consistent with Appellant's

49

RR49

admitted method of operation. N.T.02/04/14, pp. 216-17. Bruce Epp confessed to driving Appellant to the Subway for the purpose of committing this robbery. N.T. 02/06/14, pp. 106-10. Mr. Epp detailed that he and Appellant had two-way radios to stay in communication if the police arrived, and that Appellant told him after the robbery that there were two Indians inside the store and he took one of the victim's car keys. Mr. Epp also observed Appellant counting money back at his apartment just following the robbery. N.T. 02/06/14, pp. 115-19. Mr. Epp further confirmed that Appellant wore all black clothing, including a coat, hooded sweatshirt, boots, gloves, and something to cover his face. Mr. Epp was even able to identify the black boots, mask, and walkie-talkies recovered from Appellant's home as those used during the commission of the robbery. See Exhibits C-27, C-28, C-29; N.T. 02/06/14, pp. 112-16. Lastly, Appellant confessed to Detective Fuhrmann that he robbed the New Britain Subway on two separate occasions, and further admitted that Mr. Epp drove him on the second robbery. N.T. 02/06/14, pp. 262-63.

There is also sufficient evidence to support Appellant's conviction in relation to the final charged robbery of the Horsham, Bucks County Subway on April 18, 2013. Rasik Panchini observed an individual dressed in all black enter the Subway as he was closing for the evening. This assailant pointed a gun to Mr. Panchini's forehead, demanded money, and kicked Mr. Panchini 2-3 times before leaving the store with approximately $1,500. N.T. 02/04/14, pp. 230-34, 249. The evidence is sufficient to support that a robbery did occur, being as the assailant used the gun to aid in unlawfully taking money from Mr. Panchini.

There is similarly sufficient evidence to support the jury's finding that Appellant was this assailant. The assailant wore all black clothing, including gloves and a mask, carried a gun, jumped over the counter, and stated that he needed the money to support his family as well,

which all correspond to Appellant's admitted method of operation. Mr. Panchini could not firmly identify the assailant's skin color due to the poor lighting in the restaurant, but he was able to affirm that the assailant was a male and taller than himself, meaning taller than 5 feet 4 inches. N.T. 02/04/14, pp. 234-37. Mr. Epp admitted to driving Appellant to that Subway in order to commit a robbery. He further recalled that the two of them used walkie-talkies to stay in communication, that Appellant again wore all black clothing, and that Appellant had a handgun on his lap as he reentered Mr. Epp's vehicle. N.T. 02/06/14, pp. 124-30. Mr. Epp was able to positively identify the handgun recovered from Appellant's home as the handgun that he observed on Appellant's lap just after the robbery occurred. See Exhibit C-4. Mr. Epp additionally recalls witnessing Appellant and his girlfriend counting money from a safe deposit box immediately after they returned from the Subway. N.T. 02/06/14, pp. 130-31. Furthermore, Appellant confessed in an interview with Detective Fuhrmann on April 19, 2013 that he committed the robbery of this Subway the prior evening. N.T. 02/06/14, p. 262.

Appellant sought to cast doubt on his commission of the Horsham Subway robbery by referencing Mr. Panchini's 911 call just following the robbery where he misidentified the assailant as being African American. See Exhibit C-19. Mr. Panchini testified at trial that he never saw the assailant's skin color due to the fact that the restaurant was completely dark, as he turned off all of the lighting before the robbery occurred. Based off the loudness of the assailant's voice, and without any reference to seeing his skin tone, Mr. Panchini assumed that he was African American. N.T. 02/04/14, pp. 236-37. Mr. Panchini reiterated that he was nervous and scared as he called 911, and that he did not actually see that the assailant was African American. N.T. 02/04/14, p. 251. Photos of the Subway restaurant introduced into evidence reflect the poor lighting that Mr. Panchini referenced. See Exhibit C-20D, C-20E. Given the circumstances of

Mr. Panchini's identification, combined with the other evidence introduced at trial and discussed above, the evidence was sufficient for the jury to find that Appellant committed the robbery of the Horsham Subway.

## B. Theft by Unlawful Taking

18 Pa.C.S.A. § 3921(a) provides that a person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof. Commonwealth v. Stevens further finds that theft is a lesser included offense of robbery, as the definition of robbery necessarily requires the commission of a theft. 352 A.2d 509, 511-13 (Pa. Super. 1975).

Appellant was convicted of one count of theft by unlawful taking in connection with each of ten different robberies, resulting in a total of ten theft by unlawful taking convictions. As has already been discussed in detail above, there was sufficient evidence presented at trial for the jury to find that ten robberies were committed, and that the Appellant was the individual who committed each robbery. As such, there is necessarily sufficient evidence to likewise find that Appellant committed the underlying thefts that formed the basis of each robbery conviction. So, for these reasons, there is sufficient evidence to find that Appellant unlawfully took money from the Langhorne Lukoil, the Mail 'n' More shipping store, each of the three Subways, the Dunkin' Donuts, and the Dollar Tree with the purpose of depriving their owners of said property.

## C. Criminal Conspiracy

Appellant has also challenged his convictions for Criminal Conspiracy. A person is guilty of conspiracy if:

> . . . with the intent of promoting or facilitating the commission of a crime, he (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the

planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a). In other words, in order to find Appellant guilty of conspiracy, the following elements must be proven beyond a reasonable doubt: "(1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator and (3) an overt act in furtherance of the conspiracy." Commonwealth v. Galindes, 786 A.2d 1004, 1010 (Pa. Super. 2001), citing Commonwealth v. Spotz, 756 A.2d 1139, 1162 (Pa. 2000). "Because it is difficult to prove an explicit or formal agreement to commit an unlawful act, such an act may be proved inferentially by circumstantial evidence, i.e., the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." Commonwealth v. Knox, 50 A.3d 749, 755 (Pa. Super. 2012) (citation omitted).

The jury found Appellant guilty of six counts of conspiracy in relation to his robberies with John Ferraro and two counts of conspiracy in regards to his robberies committed with the help of Bruce Epp. Viewed in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to support the imposition of guilt on each of these charges.

The jury found that Appellant engaged in six robberies with the help of Mr. Ferraro, namely, the two robberies at the Lukoil, the two at the Fairless Hills Subway, the first New Britain Subway robbery, and the Dunkin' Donuts robbery. Appellant's intent to commit these robberies can be inferred by his conversations with Mr. Ferraro, where Appellant informed Mr. Ferraro of his desire to commit robberies so that he can gain money, as he was losing his house and his girlfriend was pregnant. N.T. 02/06/14, pp. 320-21. Mr. Ferraro further testified to the agreements he made with Appellant to drive him on these robberies that saw Mr. Ferraro receive small amounts of money for gas. Any agreement to commit criminal conduct can also be inferred by the actions that Mr. Ferraro took in knowingly driving Appellant to these robberies and the

Appellant's actions in committing the acts and paying Mr. Ferraro for his part. N.T. 02/06/14, pp. 327-346. Appellant even admitted to "pressuring" Mr. Ferraro into helping with the robberies. N.T. 02/06/14, pp. 262-63. And finally, the overt act requirement is likewise satisfied as Appellant successfully carried out all six robberies. Therefore, there is sufficient evidence to support the finding that the elements of conspiracy were met with respect to each of the six robberies in which Mr. Ferraro was a co-conspirator.

The jury found that Appellant conspired to commit two robberies with Bruce Epp. The Appellant's intent to commit these robberies can be inferred from his conversation with Mr. Epp, where he confided to Mr. Epp that he was committing robberies and might need a driver to help him with any in the future. Appellant again confronted Mr. Epp days later asking for help with his robberies, as he needed money because his girlfriend, who was Mr. Epp's cousin, was pregnant and they were about to get evicted. Mr. Epp testified that he agreed to drive Appellant in his robberies. N.T. 02/06/14, pp. 101-03. The agreement can also be inferred by Mr. Epp's actions in driving Appellant on two robberies, and his receipt of some of the proceeds of each robbery. N.T. 02/06/14, pp. 120, 133. Appellant also confessed to Detective Fuhrmann that he "pressured" Mr. Epp to help him in the commission of these offenses. And finally, the overt act requirement is likewise satisfied as Appellant successfully completely both robberies. Therefore, there is sufficient evidence to support the finding that the elements of conspiracy were met with respect to both robberies in which Mr. Epp was a co-conspirator.

### D. Terroristic Threats

18 Pa.C.S.A. § 2706(a)(1) provides that a person is guilty of the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another. In other words, the elements of terroristic threats consist

54

RR54

of "1) the defendant making a threat to commit a crime of violence, and 2) the threat being communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." Commonwealth v. Reynolds, 835 A.2d 720, 730 (Pa. Super. 2003). This Court has previously held that no verbal threat is required for the elements of this offense to be satisfied, so long as there is a "communicated threat to commit a crime of violence." Commonwealth v. Wintz, 1 Pa. D. & C.4th 299, 303 (Com. Pl. 1988) (a person in one moving vehicle who points a shotgun out of a window towards the occupants of another commits the crime of terroristic threats).

The jury found Appellant guilty of five counts of terroristic threats in relation to his conduct during the robberies at the Mail 'n' More, the two New Britain Subways, and the Horsham Subway. Viewed in the light most favorable to the Commonwealth as verdict winner, the evidence is sufficient to support each of these convictions.

During the robbery of the Mail 'n' More shipping store, Appellant used a gun in the commission of the theft. Appellant pulled the gun out of his pocket and demanded money from both Mr. Johnson and Mr. McCormick. Appellant even stated as Mr. Johnson was looking at his gun, "Don't be a hero." N.T. 01/31/14, pp. 46-47, 51. Despite the fact that Appellant did not make a verbal threat to the victims, the presence of the gun necessarily begs the inference that the victims would be shot if they did not comply with his request for money. It is clear that the Appellant used this gun for the specific purpose of terrorizing Mr. Johnson and Mr. McCormick into surrendering any money in the store to the Appellant. As such, there was sufficient evidence for the jury to determine that the elements of the crime of terroristic threats were met with respect to both victims.

Appellant similarly used a gun in the commission of the two New Britain Subway robberies. On February 28, 2013, Appellant entered into the back door of the Subway, brandishing a gun in the presence of Cameron Ralston. Upon seeing the gun, Mr. Ralston immediately put his hands up, and informed Appellant that, "This job is not worth getting killed over." N.T. 02/04/14, pp. 13-15. Mr. Ralston reasonably interpreted Appellant's carrying of the gun as a threat to harm him, and Appellant intended to induce this sort of terror in the victim, so as to entice Mr. Ralston into handing over as much money as possible. Moreover, Appellant carried that identical gun in the April 11, 2013 robbery of that same Subway restaurant. Appellant brandished that gun in the presence of Mukesh Patel and demanded Mr. Patel give him money. N.T. 02/04/14, pp. 215-17. Mr. Patel was admittedly frightened by the gun, which was Appellant's intent. N.T. 02/04/14, p. 223. As Appellant used the gun in order to threaten the possibility of violence if Mr. Patel did not cooperate, and Appellant's intent was to cause the terror that Mr. Patel felt, there is sufficient evidence to support the jury's verdict.

The Appellant likewise brandished a gun in the robbery of the Horsham Subway on April 18, 2013. Appellant entered the Subway and immediately put the gun to Rasik Panchini's forehead, before ultimately forcing Mr. Panchini to surrender the contents of the register and a small change box as well. By placing the gun to the victim's forehead, Appellant threatened to commit a crime of violence if Mr. Panchini did not cooperate. Appellant also possessed the intent to terrorize the victim in such a way, as it improved the chances that the victim would give Appellant the money that he desired. Therefore, viewed in the light most favorable to the Commonwealth, there is sufficient evidence to support Appellant's conviction.

## II. Evidentiary Issues

In his matters complained of on appeal, the Appellant raises ten claims concerning the admission of evidence at his trial. We begin our analysis by noting that the Pennsylvania Supreme Court has consistently held that the admission of evidence at trial is addressed to the sound discretion of the trial court, and such evidentiary rulings will not be disturbed absent an abuse of that court's discretion. See Commonwealth v. Champney, 832 A.2d 403, 416 (Pa. 2003); Commonwealth v. Ragan, 645 A.2d 811, 818 (Pa. 1994). Each of Appellant's claims will be discussed herein.

## A. Voice Identification

The Appellant's second, third, and seventeenth matters argue that Cameron Ralston's voice identification irreparably prejudiced the Appellant, and Appellant's motion for a mistrial therefore should have been granted. For the reasons discussed below, we find this argument to be without merit.

A motion for mistrial is a matter addressed to the sound discretion of the trial court. A court "need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." Commonwealth v. Jones, 668 A.2d 491, 502-03 (Pa. 1995) (citations omitted).

It is well-settled that reliability is the lynchpin of deciding the admissibility of voice identifications. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). To aid in reliability determinations, a court should look to the following factors:

> The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

Id.

In the case sub judice, Cameron Ralston testified that he heard the assailant's voice saying "I love you too" while sitting on a bench outside of the courtroom as Appellant's trial was finished for the day. He further testified that he immediately informed both the NOVA[6] representative and his father, who were both sitting beside him at the time. The immediacy of Mr. Ralston notifying these individuals lends credence to the accuracy of his identification of the voice. Additionally, as Mr. Ralston admitted that he did not see who exactly uttered the comment, there is no danger that he observed Appellant in custody, and allowed the prejudice associated with Appellant's condition as the defendant in the case to influence his identification.

Mr. Ralston also had a significant and meaningful opportunity to hear the assailant's voice at the time of the crime. The assailant was in Mr. Ralston's Subway store for approximately twelve minutes, during which time he engaged Mr. Ralston in nearly constant conversation. The event clearly had a lasting impact on Mr. Ralston and remained emblazoned in his memory, as he was able to recount many of the exact details of that evening, including recalling the exact minute that he left the store and eventually called the police. As with his certainty in making the identification, Mr. Ralston's memory of his encounter with the assailant further strengthens his later identification.

There is likewise minimal danger of a corrupting effect of this identification on a jury. The jury heard Mr. Ralston's recounting of that night and the exact circumstances of the later identification. It is for the jury to decide what weight, if any, to give this evidence. Moreover, the Court was careful for the jury not to hear any testimony detailing that the defendant was in custody at the time of the voice identification, thereby

---

[6] "Network of Victim Assistance" is a nonprofit organization that helps victims of all types of crime.

preventing the jury from drawing any prejudicial inferences from that fact. Furthermore, there is no danger in the Commonwealth's use of a police officer to complete Mr. Ralston's identification, as analogous case law suggests.

There is currently no case law in Pennsylvania that is exactly on point, however, the Superior Court has decided several cases that present a similar issue. For instance, the Superior Court has held that it is permissible to introduce a victim's testimony identifying an individual's face and physical features as being the same as a perpetrator's, then allowing police officer testimony identifying that individual as the defendant. See Commonwealth v. Sanders, 394 A.2d 591 (Pa. Super. 1978); Commonwealth v. Dean, 445 A.2d 1311 (Pa. Super. 1982). In Sanders, the victim identified her assailants after viewing a police mug shot book, and police officers testified at trial as to their identities. Sanders, 394 A.2d at 594. This evidence was properly admitted as "the declarant was present in Court and could have been examined by defense counsel and the jury could have observed her demeanor as she answered his questions." Id. Similarly, Dean held that where the victim of a sexual assault identified her assailant in a line up, an officer was permitted to testify in open court that she had identified the defendant. Dean, 445 A.2d at 1312. Superior Court held that "the trial court's discretion in permitting testimony by the officer on the subject of identification at line-up was properly exercised, and presents no appealable issue." Id. at 1313.

Additionally, the Superior Court has applied the same rationale to cases specifically involving a voice identification issue. In Commonwealth v. Topa, a perpetrator called 911 to confess to a murder that just occurred, however he misidentified himself as "Roger Ferretti." 410 A.2d 354, 357 (Pa. Super. 1979). The Commonwealth introduced the recording into evidence as it insisted that the voice on the tape belonged to the perpetrator. Id. Mr. Ferretti then testified that

he did not make the call, but as an acquaintance of the defendant, he could recognize the voice as belonging to him. The Court held that the voice identification testimony was properly allowed, as "the credibility of Ferretti's testimony and the weight to be given to it were proper subjects for the determination of the jury." Id.

Here, Mr. Ralston recognized a voice that he heard outside of the courtroom as belonging to his assailant. This voice uttered the phrase, "I love you too." The Commonwealth then called Detective Amoroso, who was also outside the courtroom that day. Detective Amoroso testified that he heard a young woman call down from the catwalk above the lobby outside of the courtroom, "I love you," in the direction of the Appellant. He then heard Appellant respond, "I love you too." The officer saw Appellant utter these words.

These facts present a similar issue to the above referenced cases, as the victim was able to make an incomplete out-of-court identification, and that identification was completed by another witness. Mr. Ralston testified that he recognized the voice of his assailant, but could not match a face with this voice. Detective Amoroso provided the testimony that affirms Appellant was the individual who made the statement that was the subject of Mr. Ralston's identification. Detective Amoroso completed the victim's identification of a perpetrator much like the testimony of the officers in Sanders and Dean, which was upheld by the Superior Court. The voice identification was properly admitted, and its appropriate weight was a question for the jury.

## B. Knowing, Intelligent, and Voluntary Statement

The Appellant's fourth matter complained of argues that this Court erred in denying the pretrial motion to suppress Appellant's statement as it was not knowing, intelligent, and voluntary. For the reasons discussed herein, we find this argument to be without merit.

The Pennsylvania Supreme Court's standard of review for reviewing a challenge to a trial court's denial of a suppression motion is well-settled as follows:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

Commonwealth v. Bomar, 826 A.2d 831, 842 (Pa. 2003) (citations omitted).

Our findings of fact and conclusions of law are as follows:

> It appears that I have to make two particular findings that are required. One is whether this statement made by Mr. Smoot is given after being given is [*sic*] Miranda warnings. I don't think that's a question, at this point, that he was given them. Question was whether I find that he knowingly, intelligently and voluntarily understood them and, secondly, whether or not he was coerced by the police in giving the statements.
>
> . . .
>
> As to my conclusion of law, I find the testimony of Detective Fuhrmann to be credible and believable and I accept it in it's [*sic*] entirety. I believe that he advised the defendant of his Miranda warnings as I read them and as has been indicated from the warnings pursuant to CS-3.
>
> And, therefore, the statement by Mr. Smoot was knowingly, intelligently and voluntarily given.
>
> Secondly, I do not believe that he was coerced into making that statement as he fully cooperated with Detective Fuhrmann and I believe that Detective Fuhrmann, as he indicated, had very little, if any, contact with Ms. Cook and, therefore, I cannot make that connection or do I think that it's a connection that I could logically conclude about the evidence.

N.T. 01/29/14, pp. 184-85.

The Pennsylvania Supreme Court, in a plurality opinion, first determined that an explicit waiver of Miranda rights was required and such an "explicit waiver" was defined as "an outward manifestation of a waiver such as an oral, written or physical manifestation." Commonwealth v. Bussey, 404 A.2d 1309, 1314 n.11 (Pa. 1979). Bussey was later applied in Commonwealth v. Hughes, in which the Superior Court found an explicit waiver of Miranda rights by a defendant's

actions where he "clearly manifested an intent to waive his rights at the time that these allegedly incriminating statements were made." 639 A.2d 763, 770 (Pa. 1994). "After a defendant is given his or her Miranda rights, a statement by the defendant that he understands those rights followed by the answering of questions posed by the interrogating officer constitutes a sufficient manifestation of a defendant's intent to waive those rights so as to satisfy state constitutional protections." Commonwealth v. Baez, 21 A.3d 1280, 1286 (Pa. Super. 2011).

Additionally, Miranda requires that "such waiver be made knowingly, intelligently, and voluntarily." Commonwealth v. O'Bryant, 388 A.2d 1059, 1061 (Pa. 1978) (citations omitted). Regarding voluntariness in particular:

> A statement is voluntary if the decision to speak was the product of a free and unconstrained choice. To determine voluntariness, the totality of the circumstances surrounding the statement must be examined, including: duration and methods of interrogation; the conditions of confinement; the manifest attitudes of the police toward the defendant; defendant's physical and psychological condition; and any other condition which may drain the defendant's power of resistance to suggestion or to undermine his ability to exercise free will.

Id. at 1062.

In the present case, this Court found at the Suppression Hearing that Detective Fuhrmann read Appellant his Miranda warnings prior to beginning the interview. The Detective read through each warning from a preprinted card, then asked Appellant if he understood his rights and if he wanted to talk to the detectives without an attorney present. Appellant responded affirmatively to each of these questions, then made incriminating statements to the Detective. These facts illustrate that Appellant understood his rights and clearly manifested his intent to waive those rights by verbally communicating his desire to speak without a lawyer present, signing the Miranda card, and then proceeding to answer the detectives' questions.

62

RR62

This Court further found that Appellant's claims of police coercion that affected the voluntariness of his waiver were without basis in fact. Our factual findings, supported by the record, indicate that there was no issue with the duration or conditions of confinement, methods of interrogation, Appellant's psychological condition, or the existence of any other element that would inhibit his ability to voluntarily waive his Miranda rights.

Given the fact that this Court's factual findings and legal conclusions drawn therefrom are supported by the record, we ask that the Superior Court deny Appellant's argument.

## C. Police Officer Opinion Testimony

The Appellant's sixth and seventh matters complained of on appeal argue that the Court erred by allowing law enforcement officers to give their opinions stating that the suspect of one of the robberies could have committed all ten robberies. It appears that Appellant takes issue with specific testimony by either Detective Edward Davies or Detective Corporal Jeffrey Cummins, in that their opinions go to the ultimate issue in the case. These contentions are addressed below.

First, a party must make a timely and specific objection in order to preserve an issue for appeal. Commonwealth v. Brown, 701 A.2d 252, 254 (Pa. Super. 1997). "The Superior Court will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected." Commonwealth v. Montalvo, 641 A.2d 1176, 1184 (Pa. Super. 1994).

Detective Davies testified that he learned of multiple robberies involving Subway restaurants and gas stations in the Lower Bucks County area, and the uniqueness of the circumstances around each robbery led him to believe that they were all "interconnected and possibly done -- most probably done by the same actor or actors." Detective Davies then

confirmed that one individual was arrested in connection with all ten robberies, the Appellant. N.T. 02/07/14, p. 87. Appellant's counsel did not lodge an objection to this line of questioning. Therefore, he did not preserve the issue for appeal, and it is waived.

Detective Cummins' opinion testimony was properly admitted over Appellant's objection. Opinion evidence can generally be offered by either lay or expert witnesses. Bessemer Stores, Inc. v. Reed Shaw Stenhouse, Inc., 496 A.2d 762, 766 (Pa. Super.1985). Additionally, Pa.R.E. 704 provides that opinion testimony is not objectionable solely because it may embrace an ultimate issue of fact in the case. The Court may exclude opinion testimony, however, if its admission would serve to confuse, mislead, or prejudice the jury. McManamon v. Washko, 906 A.2d 1259, 1276 (Pa. Super. 2006).

> In order for a ruling on evidence to constitute reversible error, it must be shown not only to have been erroneous, but harmful to the party complaining. The appellant must prove the court erred in admitting the challenged evidence and that the appellant was unduly prejudiced thereby.

Id.

The opinion evidence at issue was Detective Cummins' testimony that after conferring with Detective Fuhrmann concerning his investigation, he developed a suspect who he thought was connected to both of the Detectives' cases, the Appellant. Initially, the record reflects that Detective Cummins stated, "after speaking with [Detective Fuhrmann], we felt that the robberies were committed by the same individual." However, Appellant's counsel objected before the Detective could identify the individual in question. After argument at sidebar, the question was rephrased, and Detective Cummins then testified that during the course of his investigation, he then developed the Appellant as a suspect. N.T. 02/06/14, pp. 32-37.

Given the rephrasing of Detective Cummins' testimony, Appellant's objections were properly overruled as there was no undue prejudice in allowing the jury to hear the revised

64
RR64

testimony. It is doubtful to suggest that the Detective's testimony, as the jury ultimately heard it, gave an opinion as to the ultimate issue in the case, whether Appellant committed the ten charged robberies. Even if so, the testimony should not have been excluded absent some form of undue prejudice suffered by Appellant or confusion caused to the jury. The Detective's admission that he developed Appellant as a suspect after conversing with another Detective does not unduly prejudice Appellant in any way or work to confuse the jury. In fact, the testimony served to inform the jury as to the course of the investigation, and as such, was properly admitted.

Appellant's referenced case of Commonwealth v. Carter is distinguishable from the facts of the present case. 589 A.2d 1133 (Pa. Super. 1991). In Carter, the testifying police officers were deemed expert witnesses, then allowed to testify to the facts of the case. After the officer discussed personally witnessing the defendant's alleged drug sales outside of a bar, he then stated that, in his opinion, the defendant was "dealing narcotics." Id. at 1134. The Superior Court held that the admission of such testimony was cumulative and prejudicial to the defendant. The Court specifically ruled that expert testimony is not needed when the matter is of common knowledge for a jury, and will thereby only encourage the jurors to defer to the officer's expertise in narcotics investigations, substituting the officer's opinion in place of their determination of the credibility of the communicated facts. Id. Carter is distinguishable from the present case in that Detective Cummins was not an expert witness and never testified as to his ultimate belief as to whether the Appellant committed the charged offenses.

### D. Eviction Evidence

The Appellant's thirteenth matter complained of on appeal alleges that the Court erred in allowing the Commonwealth to introduce evidence in various forms averring that Appellant was

65
RR65

behind on his rent and had a landlord-tenant hearing scheduled for December 2012. Each instance where such evidence was admitted will be discussed below.

To begin our analysis, we note that admissibility of any eviction evidence depends upon "whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." Commonwealth v. Hawk, 709 A.2d 373, 376 (1998) (citations omitted). Any evidence of Appellant's landlord-tenant hearing is probative of Appellant's motive to commit the robberies in question. Moreover, any such evidence corroborates Appellant's co-conspirators' testimony citing Appellant's monetary problems and the testimony of the various victims who recalled their assailant's references to losing his home. As such, the evidence is relevant and highly probative. As demonstrated below, each reference to Appellant's landlord-tenant proceeding also survives any hearsay challenge as well.

Detective Campbell and Detective Fuhrmann's testimony concerning their discoveries that Appellant had a landlord-tenant hearing the same day as the suspect of various robberies claimed he was being evicted was not hearsay and, as such, was correctly admitted. Pa.R.E. 801(c) defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." It is well-established that an out-of-court statement offered to explain a course of conduct is not hearsay. Commonwealth v. Cruz, 414 A.2d 1032, 1035 (Pa. 1980).

Detective Campbell testified that the robber of the Mail 'n' More on December 10, 2012 told the victims that he would be losing his home on December 18, 2012. Detective Campbell testified to this fact not to assert that the robber actually lost his home on said date, but rather to

66
RR66

inform the jury as to why he then searched all local eviction proceedings occurring on that date, ultimately discovering Appellant's scheduled landlord-tenant hearing. N.T. 01/31/14, pp. 97-104. As the statement was offered to explain how the Detective's investigation ultimately lead him to identify the Appellant as a suspect, it is a valid, non-hearsay statement.

Similarly, Detective Fuhrmann also referenced a statement made by a robbery victim to him communicating that the robber was losing his house on December 18, 2012. N.T. 02/06/14, p. 231. As was the case with Detective Campbell's testimony, Detective Fuhrmann's use of the statement was limited to informing the jury as to why he took his chosen course of conduct in investigating the robbery. The Detective already identified the Appellant as a suspect, and based on the victim's statement, the Detective then searched the local District Court for landlord-tenant proceedings. N.T. 02/06/14, pp 231-34. The Detective was not introducing the statement for its truth, so the statement was not hearsay.

The introduction of a certified record of Appellant's landlord-tenant hearing through Detective Campbell was likewise validly admitted in accordance with the rules of evidence. 42 Pa.C.S.A. § 6103(a) permits:

> An official record kept within this Commonwealth by any court, magisterial district judge or other government unit, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by that officer's deputy, and accompanied by a certificate that the officer has the custody.

Moreover, neither §§ 6103 or 6104 mandate that personal knowledge is a requirement for the admission of an official record into evidence. Commonwealth v. Visconto, 448 A.2d 41, 45 (Pa. Super. 1982).

The certified record of Appellant's eviction notice and proceeding was admitted through the testimony of Detective Campbell. Detective Campbell was not involved in the preparation of

the records in any way. N.T. 02/06/14, p. 17-18. However, the law does not require personal knowledge as a prerequisite for the introduction of a certified record. The record of the Appellant's landlord-tenant proceeding was kept by the Magisterial District Court of Judge Daniel Baranowski, affixed with the court seal, and accompanied by a signed certification that verified the authenticity of the document. As such, the record was duly admitted into evidence. See Exhibit C-21.

### E. Prior Bad Acts

Appellant's fourteenth, fifteenth, and eighteenth statements of matters complained of on appeal allege that the Court improperly allowed the Commonwealth to introduce evidence of prior bad acts.

Pa.R.E. 404(b)(2) provides that evidence of prior bad acts is admissible for purposes other than to show propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Additionally, this evidence is also permissible in order "to complete the story of a crime." Commonwealth v. Lark, 543 A.2d 491, 497 (Pa. 1988). More specifically, evidence of the prior bad acts can be admissible as part of the "chain of events" which became "part of the history of the case and formed part of the natural development of the facts." Id.

Appellant's issues with prior bad acts relate to the Commonwealth's introduction of evidence of Appellant's use of Percocet pills. Bruce Epp testified that just prior to the April 11, 2013 robbery of the New Britain Subway restaurant, Appellant snorted some Percocet. N.T. 02/06/14, p. 187. Additionally, Mr. Epp testified that immediately following the April 18, 2013 robbery of the Horsham Subway, he purchased Percocet for Appellant from a person that he

knew in his apartment complex, and Appellant paid for the pills using the proceeds of that night's robbery. N.T. 02/06/14, pp. 131-34, 186-87. This evidence of Appellant's prior bad acts was introduced as part of the chain of events of each robbery. The details of Appellant's Percocet use formed part of the "natural development of the facts," and as such, these specific instances of Percocet use were admissible.

Appellant's prior Percocet use also satisfied the requirements of 404(b). The Commonwealth introduced this evidence not to prove Appellant's propensity for committing criminal acts, but rather to establish a motive for Appellant to commit the robberies. Motive is included in the list of permitted uses of prior bad act evidence set forth in Pa.R.E. 404(b)(2). The probative value of the evidence also outweighed the potential for unfair prejudice, as mandated by 404(b)(2). Appellant's Percocet use flowed directly from the proceeds of the April 18, 2013 robbery. Additionally, the April 11, 2013 Percocet use helped Appellant to "amp himself up" for the ensuing crime. N.T. 02/07/14, pp. 131-134, 187. As such, the probative value of the evidence was significant and outweighed any potential for prejudice stemming from these instances.

Lastly, Bruce Epp's confirmation on redirect examination that Appellant used Percocet generally prior to April 11, 2013 was also admissible, as Appellant's counsel opened the door to evidence of overall prior drug use through his cross-examination of Mr. Epp. If an Appellant opens the door to a fact, the Appellant cannot complain if the Commonwealth chooses to explore further any information that was behind that door. Commonwealth v. Smith, 17 A.3d 873, 914 (Pa. 2011). Appellant's counsel questioned Mr. Epp extensively about his own Percocet use, including if he was a "pill popper," the exact details concerning how he used the Percocet, why he used Percocet, how he got the pills, and how much he paid for his pills. N.T. 02/06/14, pp. 154-57. Through such cross-examination aimed at establishing a possible motive for Mr. Epp to

commit the robberies, Appellant's counsel opened the door for the Commonwealth to similarly explore Mr. Epp's knowledge of Appellant's history of Percocet use for the same purpose. So Mr. Epp's indication on redirect examination that he observed the Appellant use Percocet before April 11, 2013 was validly permitted.

At trial, Appellant also moved for a mistrial as a photograph featuring evidence of Appellant's possible marijuana use was introduced into evidence. A motion for mistrial is a matter addressed to the sound discretion of the trial court. A court "need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." Commonwealth v. Jones, 668 A.2d 491, 502-03 (Pa. 1995) (citations omitted).

The Commonwealth introduced a photograph into evidence of the top of Appellant's dresser that was taken during the search of Appellant's apartment on the afternoon of April 19, 2013. See Exhibit C-24S. Among other items, this photograph featured two clear, stand-up style bong pipes. Appellant's counsel did not object to the admission of the photograph despite having a great deal of time to examine each of the photographs prior to their admission into evidence. Only after C-24S was admitted and after the sponsoring witness' testimony concluded did Appellant move for a mistrial. Despite the fact that the prejudice of C-24S likely outweighs its probative value, such prejudice does not nearly rise to the level required to deprive Appellant of an impartial trial, and therefore his motion for a mistrial was denied.

Additionally, the Superior Court has established that an appellant cannot complain of prejudicial error on appeal after he elects against the available relief at trial. Commonwealth v. Quartman, 385 A.2d 429, 432 (Pa. Super. 1978). Appellant's counsel's failure to object when the evidence was admitted waived any possible objection, yet the Court still offered to provide a cautionary instruction in an attempt to cure any potential prejudice done by counsel's error.

70

RR70

However, Appellant declined the Court's curative efforts. As Appellant did not object to this exhibit when presented with the opportunity and further elected against the available remedy for his own error at trial, this Court was well within its discretion to deny the motion for mistrial.

## III. Denial of Motion for Severance

It is well established that a motion for severance is addressed to the sound discretion of the trial court, and that its decision will not be disturbed absent a manifest abuse of discretion. Commonwealth v. Jones, 610 A.2d 931, 936 (Pa. 1992). Offenses charged in separate informations may be tried together if "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion," or if the offenses are "based on the same act or transaction." Pa.R.Crim.P. 582(A)(1).

When offenses not based on the same transaction are joined together in the same information, the Pennsylvania Supreme Court has established a three part test to determine the propriety of consolidation. A trial court must analyze:

> . . . whether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses.

Lark, 543 A.2d at 497. Generally, evidence of another crime is inadmissible to prove behavior in conformity therewith; however, such evidence can be introduced for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2).

The court may order separate trials of offenses if it appears that consolidation will cause any party to be prejudiced. Pa. R. Crim. P. 583. Prejudice "would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was

71

RR 71

incapable of separating the evidence or could not avoid cumulating the evidence." Lark, 543 A.2d at 499.

In the present case, Appellant's motion to sever the ten robbery cases was properly denied, as the 3 part Lark test was satisfied. First, evidence of each of the ten robberies would have been admissible in trials for the others. Testimony from the various witnesses supplied that the individual who committed each of the robberies was a Caucasian male, wore all black clothing, usually specifying a black hooded sweatshirt and baggie black pants, brandished a dark color handgun, appeared during nighttime hours, and always targeted retail establishments. The crimes also occurred during a ten month period of time, and each of the victim stores was located along a corridor in between the Appellant's Levittown home and his mother's Warrington Township residence. Additionally, this individual consistently justified the robberies to his victims by claiming that he was losing his house and he needed the money for his family, usually referencing two daughters. This evidence would have established the common identity of the Appellant, and the references to his eviction and family would have likewise established a common motive for the robberies.

The evidence of each crime would have also been admissible to determine a common plan or preparation for each offense. As stated above, Appellant targeted retail establishments in general, but more specifically, he targeted either Subway stores or places where he was intimately familiar. The Appellant robbed five Subway sandwich shops. He robbed a Dollar Tree because he mistakenly believed it was a Subway and further robbed a Dunkin' Donuts store because his driver, Mr. Ferraro, was too tired to drive to Appellant's desired Subway target. The remaining robberies targeted the Mail 'n' More, where Appellant previously worked, and a

72

RR72

Lukoil gas station that was located near fifty yards from an auto shop where Appellant was likewise previously employed.

The method by which Appellant conducted the robberies also demonstrates a common preparation and plan. For each robbery, Appellant waited until nightfall, wore similar black clothing and a mask, brandished the same handgun, threatened the victims through use of the handgun, apologized and justified his efforts as necessary to keep his home and feed his daughters, and typically used a close friend as a driver.

The testimony provided by each of Appellant's drivers, both Bruce Epp and John Ferraro, further highlights the idea of a common identity, motive, and plan. And of course, it cannot be forgotten that Appellant himself verified these purposes through his own confession communicated to Detective Fuhrmann.

Second, the record demonstrates that the evidence was capable of being easily separated by the jury, thereby limiting the danger of confusion. Each of the robberies occurred on a different date, and with few exceptions, different witnesses supplied the testimony that relayed the facts of each robbery. The jury could have easily parsed through the relevant facts with minimal danger of confusion. In fact, the only testimony that delved into specifics concerning all ten robberies was provided by Detective Fuhrmann, who communicated the details of the Appellant's confession that implicated him in each of the ten robberies.

Lastly, Appellant was not unduly prejudiced by the consolidation of the ten robbery cases. The evidence of each crime did not prove the propensity of the Appellant to commit crime, but rather illustrated the common identity, motive, and plan that were present during each offense. Additionally, there was no danger that the jury simply viewed the evidence of each crime in the aggregate, giving the evidence a cumulative effect, as the respective evidence was

easily separated by each charged offense. Therefore, Appellant's motion to sever the ten robbery charges was properly denied.

## IV. Denial of Motion for Continuance

The Appellant's fifth matter complained of on appeal insists that the Court erred in denying Appellant's motion for a continuance where Appellant hired new counsel only weeks prior to the date set for trial. This issue will be discussed herein.

The allowance of a motion for a continuance is largely within the sound discretion of the trial court, and a denial of such a motion will only be deemed reversible error if the court abused its discretion. Commonwealth v. Kittrell, 427 A.2d 1380, 1381 (Pa. Super.1981). Generally in deciding if a court "abuses its discretion in denying a continuance, an accused's right to choose a particular counsel, which is not absolute, must be weighed against the public need for the efficient and effective administration of justice." Id. More specifically:

> Although the accused may personally elect to waive his right to a speedy trial, he clearly cannot be permitted to utilize his right to choose his own counsel so as unreasonably to clog the machinery of justice and hamper and delay the state in its efforts to do justice with regard both to him and to others whose rights to speedy trial may thereby be affected.

Commonwealth v. Robinson, 364 A.2d 665, 674 (Pa. 1976).

Appellant's hiring of new counsel soon before the date set for trial served to "clog the machinery of justice." Appellant has been represented by three different lawyers at various times throughout the process. The changes in counsel, while Appellant's legal right to do so, have caused lengthy delays in the case. The trial date was initially set for October 28, 2013, where Appellant was represented by the Bucks County Public Defender's Office. N.T. 01/29/14, pp. 16-19. However, Appellant refused to speak with his appointed counsel, insisting that he would obtain counsel privately. So the trial was continued until December 19, 2013. During the majority of that time, Appellant did not acquire private representation. Shortly before that date,

74 ·
RR74

Appellant hired Michael Nix as his trial counsel. N.T. 01/29/14, pp. 19-20. As a result of the short notice for Mr. Nix, the trial was rescheduled again. After consulting their individual schedules, the Court, Appellant's counsel, the District Attorney, and counsel for Appellant's then co-defendant decided upon January 29, 2014 as the trial date. The Court then confirmed that due to the natural complexities involved in scheduling this case comprised of ten distinct robberies, there would be no more continuances granted and all parties must be ready to proceed on the agreed upon date. N.T. 01/29/14, pp. 20-21. The Commonwealth affirmed to the Court that in a December 30, 2013 conversation with Mr. Nix, there was a consensus that all parties would be prepared to proceed to trial on the agreed upon date, providing that no there was no earlier resolution. N.T. 01/29/14, p. 36. On January 13, 2014, the District Attorney first gained knowledge that Appellant hired Clinton Johnson, who was Appellant's eventual trial counsel. N.T. 01/29/14, pp. 22-23.

Mr. Johnson entered this case knowing that the trial date was set for January 29, 2014 without the possibility of continuance. The Court had continued the case previous times in order to accommodate Appellant's fluctuating legal counsel, and any further attempt to continue the case would have had a negative effect on the thirty or more witnesses that the Commonwealth expected to provide testimony. Considering the prior continuances for similar reasons, the fact that Appellant's original trial counsel affirmed that he would be ready to proceed by the January 29 date, the scheduling conflicts that approximately thirty witnesses would incur, and the scheduling issues for the Court, the Court did not abuse its discretion in denying the motion for a continuance.

V. **Lack of Victim Testimony**

75

Appellant's sixteenth matter complained of on appeal argues that the Court erred in not granting Appellant's Motion for Judgment of Acquittal in relation to the March 23, 2013 robbery of the Dunkin' Donuts. In support of the issue, Appellant specifically references the fact that the prosecution did not call the victims of the robbery to offer evidence against the Appellant. This argument is without merit for the reasons discussed herein.

There is no requirement that the Commonwealth call the victim of a crime to testify at trial, so long as the victim's testimony is not being withheld because it would be unfavorable to the Commonwealth's case. Commonwealth v. Leatherbury, 469 A.2d 263, 266 (Pa. Super.1983). However, the Commonwealth must generally disclose the victim's name and whereabouts at time of trial to the defense, unless the defense would be able to locate the witness through their own devices. Id. at 266-67.

The victims of the Dunkin' Donuts robbery were not called to testify at trial. The Commonwealth represented that both of the victims no longer resided at their last known addresses and were unavailable at time of trial. Appellant made no allegation that their testimony was being withheld solely because it would be unfavorable to the Commonwealth. As such, the Commonwealth did not need to call these victims to testify, and the Court did not err in denying Appellant's Motion of Judgment of Acquittal on these counts as a result. Additionally, as discussed above, there was sufficient evidence to convict Appellant of the charges stemming from this robbery even absent the testimony of the two victims, so the Motion was correctly denied.

VI. **Newly Discovered Evidence**

The Appellant's twelfth claim alleges that newly discovered alibi evidence for the February 23, 2013 Subway robbery would be sufficient for the jury to find Appellant not guilty at a new trial. For the reasons discussed below, we find no merit to Appellant's contention.

Pa.R.Crim.P. Rule 720 permits an individual to file a post-sentence motion for a new trial based upon after-discovered evidence. To be granted a new trial on the basis of after-discovered evidence, Appellant must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. Commonwealth v. Padillas, 997 A.2d 356, 363 (Pa. Super. 2010) (citation omitted). Appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted. Id.

Appellant fails to establish the first element: that he could not have obtained the new evidence, alibi testimony from Kathleen Moser, prior to the conclusion of trial by the exercise of reasonable diligence. This alibi evidence would have been in the exclusive knowledge and control of Appellant, so barring the unavailability of the witness, there is no reason why such evidence could not have been presented at trial. Appellant has made no showing of why Ms. Moser was unavailable or why he could not locate her prior to trial. As such, the first element is not satisfied.

Appellant similarly fails to establish the final element: that the evidence would likely result in a different verdict if a new trial was granted. The verdict in this case was supported by overwhelming evidence, not only in respect to all ten robberies generally, but also to the February 23, 2013 Subway robbery individually. Concerning the February 23, 2013 robbery,

77

RR 77

Vishal Patel gave a description of the assailant that matched the Appellant. The assailant claimed that he could not afford his home, and Appellant had an eviction proceeding two months prior. Appellant owned a gun with a green grip that Mr. Patel positively identified at trial as the same weapon used by his assailant. John Ferraro, the admitted driver of the assailant, also confessed that he drove Appellant to that Subway restaurant on two separate occasions in order to commit a robbery. Appellant even confessed to a detective that he robbed that Subway twice and gave brief details of each that corroborated the victims' accounts. In light of this evidence, the Court cannot find that a different verdict would likely result if the after-discovered evidence were presented to a jury at a new trial. Therefore, Appellant is not entitled to a new trial on the basis of after-discovered evidence.

## VII. Prosecutor's Argument to Jury

Appellant contends that the prosecutor improperly argued to the jury that (1) "there were other robberies that occurred that the Defendant had not been charged with," and (2) "essentially that the jury had to determine that the police officers, who investigated the robberies and testified at trial, were corrupt or the jury had to find the Defendant guilty." This Court finds that not only were the prosecutor's statements to the jury proper, but Appellant has not preserved his right to appeal on these grounds.

Remarks of counsel cannot form a basis for a new trial in the absence of timely objection. Narciso v. Mauch Chunk Twp., 87 A.2d 233, 235 (Pa. 1952). "The reason for this rule is obvious. In many cases the effect of an erroneous or misleading statement can be corrected if it is called to the court's attention immediately but if a party chooses to remain silent we must assume that he felt the remark did him no harm." Id. If no objection is made at the time of the

78

prosecutor's statement or at the conclusion of the prosecutor's argument, then the objection is waived. Commonwealth v. Williams, 455 A.2d 632, 634 (Pa. 1983).

In the present case, Appellant's counsel did not object to any portion of the Commonwealth's opening or closing remarks to the jury that referenced other robberies or any allegation of the police officers involved in the case being corrupt. There are no recorded objections to the Commonwealth's opening argument, and the only recorded objection to the closing argument concerns the Commonwealth's mention of Appellant's use of Percocet. N.T. 02/07/14, pp. 334-38. Appellant, through his counsel, did not object to these statements made by the prosecutor, which did not give the Court an opportunity to cure any harm that was done to the Appellant. Due to Appellant not bringing these issues to the Court's attention, it was and is assumed that no harm was indeed done. Therefore, the Appellant did not preserve these issues for appeal.

This Court will also note that any comments made by a prosecutor before the jury "must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing." Commonwealth v. Chmiel, 889 A.2d 501, 543 (Pa. 2005). During Appellant's closing, his counsel advanced arguments that Appellant's confession may have been fabricated by the Detectives, and any remarks made by the Commonwealth referencing corruption were in direct response to Appellant's arguments. Even a plain reading of the Notes of Testimony evinces that the Commonwealth was simply responding to Appellant's closing, and there was no indication of Commonwealth instructing the jury that it must find Appellant guilty or the officers corrupt, as Appellant claims on appeal.

## VIII.   Alleged Brady Violation

79

R R 79

In his nineteenth, twentieth, and twenty-first matters complained of on appeal, the Appellant argues that the Commonwealth failed to disclose negotiated deals with co-defendants Bruce Epp and John Ferraro as required by Brady, and as such, the guilty verdicts should be arrested and the Appellant discharged. For the reasons discussed herein, these matters complained of are meritless.

The Supreme Court held in Brady v. Maryland that an individual's due process rights are violated where the prosecution fails to disclose evidence favorable to an accused that is material to guilt or punishment. 373 U.S. 83, 87 (1963). The Pennsylvania Supreme Court has further ruled that a Brady violation occurs where "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." Commonwealth v. Carson, 913 A.2d 220, 244 (Pa. 2006).

The record in the instant case does not reflect that any Brady violation occurred, as no part of the 3 part test is satisfied. Appellant alleges that the Commonwealth failed to disclose evidence of negotiated sentencing agreements with both co-defendants, however, the record strongly indicates that no such evidence existed. Prior to Appellant's trial, the record reflects that Appellant's counsel sent a letter to the Commonwealth requesting information concerning any agreements or understandings between the Commonwealth and any witnesses in exchange for their cooperation. Appellant's counsel concedes that the Commonwealth informed him that there was a negotiated sentence with Bruce Epp for 2.5 to 5 years, and that John Ferraro pled open and would be sentenced after Appellant's trial. N.T. 10/15/14, pp. 35-37. During direct examination, Bruce Epp clearly detailed that the Commonwealth did not negotiate a deal with him in exchange for his testimony. Instead he delineated that the Commonwealth promised him a recommended sentence of 2.5 to 5 years, but that the judge was not bound by the recommendation. N.T.

02/06/14, pp. 142-43. Similarly, John Ferraro also confirmed on direct examination that there was no deal between himself and the Commonwealth as a result of his testimony. N.T. 02/06/14, pp. 335-36.

Appellant's contention that the Commonwealth failed to disclose a negotiated agreement stems from the prosecutor's errant admission in responding to a question by the Court at Appellant's sentencing that the sentences for Mr. Epp and Mr. Ferraro were both negotiated. N.T. 06/20/14, p. 133. In arguing post-sentence motions, Appellant's counsel cited that a member of Mr. Ferraro's family told Appellant that Mr. Ferraro negotiated a deal of 6 years with the Commonwealth, and Appellant discovered that Mr. Ferraro was then sentenced to 6 years. However, the record does not confirm this speculative account.

The prosecutor admitted on the record that she inadvertently told the Court that Mr. Ferraro's sentence was negotiated. The prosecutor also detailed that she contacted Appellant's counsel as soon as she uncovered the errant statement to inform him of the mistake. Appellant's counsel concedes that the prosecutor so told him in an email dated August 4, 2013. N.T. 10/15/14, pp. 72-73, 84. The prosecutor also cited to Mr. Ferraro's sentencing, where the record clearly shows that the Commonwealth requested a sentence of 8 to 16 years, which would have been within the guidelines for each offense. The Court declined to follow the Commonwealth's request and instead imposed a sentence of 6 years. Furthermore, the Court also declined to give Mr. Epp a 2.5 to 5 year sentence, instead sentencing him to 2 to 4 years. N.T. 10/15/14, p. 38. As such, the facts of the case strongly oppose the allegation that the Commonwealth failed to disclose any negotiated agreement with Mr. Ferraro or Mr. Epp, and therefore, the Commonwealth did not commit a <u>Brady</u> violation by suppressing any such evidence. The Appellant's argument be denied.

81

RR 81

## IX. Sentence Imposed

Appellant asserts that the sentence imposed by this Court was excessive. At the outset, we note that no automatic right of appeal exists for a challenge to the discretionary aspects of sentencing. Rather, this type of appeal is more appropriately considered a petition for allowance of appeal. Commonwealth v. Rossetti, 863 A.2d 1185, 1193 (Pa. Super. 2004). Before reaching the merits of a discretionary sentencing issue, a court must ascertain whether an appellant (i) filed a timely notice of appeal, (ii) properly preserved the issue to be heard on appeal, (iii) filed a brief free of fatal defects, and (iv) raised a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. Commonwealth v. Mastromarino, 2 A.3d 581, 588 (Pa. Super. 2010).

A court evaluates whether a particular issue raises a substantial question on a case-by-case basis. Rossetti, 863 A.2d at 1193. "[The court] will grant an appeal only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc). "[A] claim of excessiveness of sentence does not raise a substantial question where the sentence is within the statutory limits." Id.

No substantial question exists as the sentence imposed upon Appellant was within the standard range of the sentencing guidelines. Therefore, Appellant's sentence is not an appealable issue. The standard range for each count of robbery is 40-54 months. This Court imposed a sentence of 48-120 months on each of seven counts, to run consecutively, and 20 years of probation each on two counts, served concurrently to one another and concurrently with the Appellant's incarceration. This Court did not sentence on the remaining robbery. The standard

82
RR 82

range for conspiracy is 30-42 months. We imposed a sentence of 5 years probation on 6 counts to run consecutively to one another, but served concurrently with the Appellant's incarceration. This Court did not sentence on the remaining two counts. The standard range for terroristic threats is 6-7 months. We imposed a sentence of 5 years probation on one count, served consecutively to the Appellant's other probation sentences, but concurrently to the Appellant's incarceration. This Court did not sentence on the remaining 4 counts.

Even assuming Appellant's sentence is an appealable issue, the sentence imposed was appropriate and should be affirmed. First, it is well-established law that the sentencing function is a matter vested within the sound discretion of the sentencing court and will not be disturbed on appeal absent a manifest abuse of discretion. See Commonwealth v. Walls, 926 A.2d 957, 961 (Pa. 2007). "[A]n abuse of discretion is more than a mere error of judgment . . . . [A] sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Id. (citations omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion." Grady v. Frito-Lay, Inc., 839 A.2d 1038, 1046 (Pa. 2003). The rationale offered by the Pennsylvania Supreme Court for this deferential standard is as follows:

> Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

Walls, 926 A.2d at 961-62 (citations omitted). Furthermore, a sentence of confinement must be "consistent with the protection of the public, the gravity of the offense as it related to the impact

on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). A sentencing court may determine a defendant's potential for rehabilitation by considering his demeanor, apparent remorse, manifestation of social conscience, and cooperation with law enforcement agents. Commonwealth v. Begley, 780 A.2d 605, 644 (Pa. 2001); Commonwealth v. Constantine, 478 A.2d 39 (Pa. Super. 1984); Commonwealth v. Gallagher, 442 A.2d 820 (Pa. Super. 1982).

In imposing Appellant's sentence, we first took into consideration the sentencing guidelines. As discussed above, Appellant was sentenced within the standard range. In sentencing Appellant, we also took into account his lack of a prior criminal history, which was also reflected in the guidelines that were submitted in the case. N.T. 06/20/14, p. 119. Additionally, this Court considered the particular circumstances of the offenses committed, the nature and character of Appellant, his background, the need to deter Appellant and others from committing these crimes, and the impact on the victims and the community at large. N.T. 06/20/14, pp. 129-31. Based upon the testimony heard at trial, Appellant demonstrated his violent nature in committing these crimes. His actions included placing a loaded gun to the head of multiple victims, including even a teenager, physically striking multiple victims, and even threatening to kill these victims who were simply trying to earn a living. N.T. 06/20/14, pp. 120-21. Such callous disregard for the victims and the welfare of those in the community were considered by this Court. N.T. 06/20/14, p. 134-35.

The impact of Appellant's offenses on the victims is, in this Court's judgment, immense and immeasurable. N.T. 06/20/14, p. 129. The numerous victims in this case have each felt trauma and terror as a result of Appellant's senseless crime spree, which was made evident through both the victim impact statements and the victims' testimony. Victims have subsequently

left their jobs, suffered anxiety, nightmares, and panic due to the Appellant. N.T. 06/20/14, p. 121, 134. And the damage is not limited to the direct victims in this case, but rather the rippling effect that Appellant's actions will have on the families of each victim has been considered as well. N.T. 06/20/14, p. 127.

We also considered Appellant's lack of remorse. The presentence report indicated that Appellant adamantly denied committing or even conspiring to commit these robberies. Appellant claimed his confession was fabricated by detectives, and he was simply guilty by association and a "victim" of circumstance. N.T. 06/20/14, pp. 122-23. Through this report and even in recorded telephone calls and visits to the prison, Appellant has demonstrated absolutely no remorse whatsoever for the destruction that he has wrought. N.T. 06/20/14, pp. 123-124.

The Appellant presented mitigating evidence which we took into account as well. This included letters and testimony from multiple family members and friends who described Appellant as the kind of person who is trustworthy, enjoyable to be around, and who ultimately isn't afraid to help others in their time of need. N.T. 06/20/14, p. 120. Before imposing sentence, this Court further considered evidence of Appellant's troubled background and his relatively young age of 28. N.T. 06/20/14, pp. 119-20, 134.

After careful evaluation of all of the above factors as well as the presentence report and mental health evaluation, we imposed sentences of 28-70 years of incarceration and 55 years of probation to run concurrently to the Appellant's sentence of incarceration. Both of these sentences were within the standard range. We believe the sentence imposed was appropriate and ask that it be affirmed.

## CONCLUSION

For the foregoing reasons, this Court perceives that the issues of which Appellant has complained in this appeal are without merit, and that this Court's June 20, 2014 Judgment of Sentence and October 17, 2014 Order denying Appellant's Post Sentence Motions were supported by both the law and the record in this case. We respectfully request the Superior Court to affirm this Court's decision.

BY THE COURT:

March 27, 2015
Date

WALLACE H. BATEMAN, JR. J.

86

RR 86